PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 08-9001

———————

KELVIN X. MORRIS

v.

JEFFREY BEARD, Acting Secretary, Pennsylvania
Department of Corrections;
CONNER BLAINE, Superintendent, State Correctional
Institution at Greene;
JOSEPH MAZURKIEWICZ, Superintendent, State
Correctional Institution at Rockview,

Appellants

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 01-cv-03070)
District Judge: Honorable Joseph H. Rodriguez

———————————

Argued November 23, 2009
Before: CHAGARES, HARDIMAN and STAPLETON,
*Circuit Judges*.

(Filed: January 26, 2011)

Stuart B. Lev [Argued]
Andrew L. Harris
Billy H. Nolas
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106-0000
        *Attorneys for Appellee*

Marilyn F. Murray [Argued]
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107
        *Attorneys for Appellants*

————————

OPINION OF THE COURT

————————


HARDIMAN, *Circuit Judge*.


Kelvin X. Morris was convicted of first-degree murder and robbery and sentenced to death in 1983 following a jury trial in Pennsylvania state court. Morris made several unsuccessful attempts to overturn his convictions and sentence in state court before petitioning the United States District Court for the Eastern District of Pennsylvania for a

2

writ of habeas corpus in 2001. After conducting an evidentiary hearing, the District Court found that while defending Morris at his original trial, his counsel had simultaneously represented Morris's brother, who was also a suspect in the murder, in an unrelated civil matter. The District Court concluded that trial counsel's concurrent representation was an actual conflict of interest that deprived Morris of effective assistance of counsel, and therefore granted him a new trial.

The Commonwealth appeals, contending the District Court erred in holding the evidentiary hearing and in ordering a new trial. Although we will affirm the District Court's decision to conduct a hearing, we will vacate the order of the District Court and remand for further consideration of Morris's request for a new trial.

I

A

The lengthy history of this case begins tragically with the senseless and brutal murder of Robert McDonald some 30 years ago. At approximately 3:00 a.m. on the morning of August 9, 1980, Philadelphia police discovered a broken window at the auto parts store that McDonald managed. When McDonald arrived at the store, he inspected the premises with an officer but found nothing else amiss. After the officer left, McDonald called a window repairman, William Linaberry, who met McDonald at the store at approximately 4:30 a.m.

As Linaberry worked on the window, he noticed a man and a group of adolescent boys at a gas station across the

3

street.  The man, who was carrying a yellow plastic bag, eventually approached McDonald and Linaberry and asked about the broken window.  As they spoke, the man drew a handgun from the bag and demanded money from McDonald.  When McDonald asked, "What money?," the man shot and killed him.  Linaberry avoided harm by hiding underneath his van.

Following the shooting, police showed Linaberry several hundred photographs, but he initially was unable to identify a suspect.  Several days later, police interviewed Ronald Johnson, who was one of the boys whom Linaberry had observed at the gas station before the murder.  According to Johnson, who was twelve years old at the time of the interview, a man approached the group at the gas station and told them to leave the area before heading across the street toward the auto parts store.  Although Johnson fled the scene as instructed, he told police that he turned as he ran and watched the man approach McDonald and Linaberry and speak with the two men before shooting one of them.

Police were able to draw a composite sketch of the shooter based on Johnson's description.  Police then showed a new array of photographs to Linaberry and Joseph Tyrone Flowers, who was another boy at the gas station.  After viewing the new photographs, both Linaberry and Flowers identified Artie Morris, Kelvin Morris's brother, as the man who had approached them at the gas station.[1]  Kelvin's

---

[1] For the sake of clarity, hereinafter we refer to Petitioner Kelvin X. Morris as "Kelvin" and to his brother, Artie Morris, as "Artie."

picture had not been included in any of the earlier photo arrays.

Police obtained a warrant for Artie's arrest and questioned both Artie and his live-in girlfriend. Both informed police that Kelvin had arrived at Artie's apartment on the afternoon of August 9, told them that he was in trouble for a shooting, and asked to stay with them for several days. Artie's girlfriend also indicated that family members had implicated Kelvin in the shooting.

Based on this new information, police showed Linaberry a new set of photographs that included a picture of Kelvin. Linaberry immediately identified Kelvin as the shooter, explaining that his previous identification had been incorrect because Kelvin and Artie resembled one another. Police also showed new photo arrays to Johnson and Flowers, both of whom had previously chosen Artie. Although Johnson this time identified Kelvin as the man who approached him at the gas station prior to the shooting, Flowers continued to maintain that Artie was the shooter.

On the strength of these new identifications, police obtained a warrant for Kelvin's arrest and located him in Suffolk, Virginia several months later, where he was being held on unrelated armed robbery charges. During an interview with Suffolk police following his arrest, Kelvin acknowledged his involvement in the robbery and murder of McDonald. Kelvin's roommate in Virginia, James Willie, also told police that Kelvin had confessed to shooting a man while robbing an auto parts store in Philadelphia. After he was tried and convicted on the Virginia charges, Kelvin was

extradited to Pennsylvania to stand trial for McDonald's murder.

B

On November 3, 1983, a seventeen-day jury trial commenced in the Philadelphia County Court of Common Pleas. When Kelvin's first lawyer was forced to withdraw prior to trial because of illness, attorney Leon Tucker was appointed. Unbeknownst to the court, however, Tucker was simultaneously representing Kelvin's brother, Artie, in an unrelated civil matter in which Artie was seeking monetary damages. The trial court was never apprised of Tucker's concurrent representation of both Kelvin and Artie.[2]

At trial, the Commonwealth's evidence consisted largely of the eyewitness identifications of Kelvin and his own inculpatory statements. Linaberry identified Kelvin as the shooter, and Johnson, who was fifteen at the time of trial, testified that it was Kelvin who approached the group of boys at the gas station prior to the murder and told them to leave the area. Flowers, who consistently maintained that it was Artie who had approached the group, did not testify.

James Willie, Kelvin's erstwhile roommate in Virginia, testified that Kelvin had admitted to shooting one of

---

[2] It was clear at the time of Kelvin's 1983 trial that Tucker had an ethical obligation to disclose this conflict to the trial court. *See Holloway v. Arkansas*, 435 U.S. 475, 485-86 (1978) ("[D]efense attorneys have the ethical obligation, upon discovering a conflict of interest, to advise the court at once of the problem.").

two men while robbing an auto parts store in Philadelphia. According to Willie, Kelvin had explained that one of the men had escaped by running and hiding under a truck. The Commonwealth also called Thomas Newsome, the Suffolk, Virginia detective who interviewed Kelvin after his arrest. Newsome testified that when questioned about the shooting, Kelvin acknowledged robbing and killing McDonald to "keep up with the crowd."

Kelvin's defense centered around a theory of mistaken identity. Attorney Tucker called two witnesses who testified that Kelvin was not the man who shot McDonald. William Meekins, who was jogging near the store at the time of the murder, testified that he saw a man standing nearby holding a bag at about the time of the shooting who looked nothing like Kelvin. Lamont Bruce, a "close" friend of Kelvin, testified that he was living near the store at the time of the murder. Bruce told the jury that he heard two shots that morning and looked out his window to see three younger men running away. According to Bruce, none of the fleeing men was Kelvin.

When cross-examining Linaberry, attorney Tucker established that Linaberry had initially identified someone other than Kelvin as the shooter. However, Tucker did not elicit or otherwise reveal to the jury during cross-examination that the man Linaberry identified was someone who resembled Kelvin, namely, Kelvin's brother and Tucker's client, Artie Morris. In fact, Tucker actually objected when the Commonwealth, on re-direct, asked Linaberry to name the person he initially identified. Nor did Tucker call Flowers, who had maintained his identification of Artie as the man who approached the group at the gas station.

7

During closing arguments, Tucker attacked Linaberry's and Johnson's identifications, arguing that they did not have a good opportunity to see the shooter's face and pointing out that both had given inconsistent identifications. Tucker also attacked the credibility of Willie, Kelvin's former roommate, who had been arrested for forging checks belonging to Kelvin's uncle. Tucker did not, however, argue or imply that the shooter was his other client, Artie Morris.

On November 30, 1983, the jury convicted Kelvin of first-degree murder and robbery. Following a penalty hearing, the jury found two aggravating circumstances and recommended a sentence of death on the murder count. After a lengthy delay in resolving several post-trial motions, on September 8, 1987, the trial court formally imposed the jury's death sentence, along with a consecutive term of ten-to-twenty years imprisonment on the robbery charge.

C

After new appellate counsel was appointed, Kelvin sought direct review of his convictions and sentence, asserting numerous errors. Although Kelvin argued on appeal that Tucker's performance at trial was ineffective for several reasons, he did not raise the issue of Tucker's conflict of interest in either his post-trial motions or on direct appeal. On September 22, 1989, the Pennsylvania Supreme Court affirmed Kelvin's convictions and death sentence. *See Commonwealth v. Morris*, 564 A.2d 1226 (Pa. 1989).

Kelvin then sought to overturn his convictions and sentence under the Pennsylvania Post-Conviction Relief Act

(PCRA), 42 PA. STAT. ANN. § 9541 *et seq*. Kelvin filed a *pro se* PCRA petition on April 2, 1990, which a new court-appointed attorney amended on October 18, 1993. Although Kelvin claimed that Tucker's trial performance was constitutionally ineffective for various reasons, he nowhere mentioned Tucker's concurrent representation of Artie. Kelvin was denied PCRA relief on January 18, 1995, and the Pennsylvania Supreme Court later affirmed that ruling. *See Commonwealth v. Morris*, 684 A.2d 1037 (Pa. 1996), *cert. denied,* 521 U.S. 1106 (1997).

On November 2, 1996, Artie died. Just over one month later, Kelvin filed a second *pro se* PCRA petition claiming, for the first time, that Tucker's simultaneous representation of Artie in the civil suit had created a conflict of interest that deprived Kelvin of the effective assistance of counsel during trial. Kelvin requested an evidentiary hearing and argued that the new claims raised in his second PCRA petition were not time-barred because Pennsylvania's "relaxed waiver rule" permitted the court to review untimely claims in capital cases. The Philadelphia County Court of Common Pleas refused to hold a hearing and dismissed Kelvin's second PCRA petition on December 21, 1999, holding that it lacked jurisdiction to review his claims because the petition had been filed beyond the PCRA's one-year statute of limitations. *See* 42 PA. STAT. ANN. § 9545(b). On May 1, 2003, the Pennsylvania Supreme Court affirmed the lower court's conclusion that Kelvin's second PCRA petition was time-barred. *See Commonwealth v. Morris*, 822 A.2d 684 (Pa. 2003).

D

9

On June 20, 2001, Kelvin filed the present petition for federal habeas corpus relief under 28 U.S.C. § 2254.[3] Kelvin's § 2254 petition raised many of the same claims as his second PCRA petition and likewise alleged that Tucker's concurrent representation of both Kelvin and Artie had created an actual conflict of interest that deprived Kelvin of effective assistance of counsel during the guilt phase of the trial.

The Commonwealth initially argued that the claims presented in Kelvin's § 2254 petition were procedurally defaulted because he had failed to comply with the PCRA's one-year statute of limitation. As such, contended the Commonwealth, the District Court lacked jurisdiction to review Kelvin's § 2254 claims because the denial of his claims was supported by an independent and adequate state

_____

[3] This habeas petition is actually Kelvin's second. On October 28, 1997, Kelvin filed an initial § 2254 petition in the Eastern District of Pennsylvania while his second PCRA petition was still pending. Kelvin's first § 2254 petition was dismissed without prejudice as a "mixed petition" under *Rose v. Lundy*, 455 U.S. 509 (1982), on March 18, 1998. When Kelvin filed the present habeas petition in June 2001, the Eastern District of Pennsylvania stayed proceedings pending the Pennsylvania Supreme Court's consideration of the denial of Kelvin's second PCRA petition. When the Pennsylvania Supreme Court affirmed the denial of PCRA relief in May 2003, this Court transferred Kelvin's § 2254 petition to Judge Rodriguez of the District of New Jersey, sitting by designation in the Eastern District of Pennsylvania, for further consideration.

ground. The District Court disagreed, holding that our decision in *Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005), effectively precluded the Commonwealth's procedural default argument.

In *Bronshtein,* we explained that the PCRA's one-year statute of limitations was not an adequate state bar to federal habeas review of claims defaulted prior to, at the very least, October 20, 1998. *Id* at 709. Before that date, Pennsylvania courts frequently applied a "relaxed waiver" rule in capital cases. *Id*. In other words, courts refused to enforce procedural rules—such as the PCRA's one-year statute of limitations—in capital cases because of the "overwhelming public interest in preventing unconstitutional executions." *Id*. at 708 (quoting *Commonwealth v. McKenna*, 383 A.2d 174, 180-81 (Pa. 1978)) (internal quotation marks omitted). Although a trio of Pennsylvania Supreme Court decisions in 1998 and 1999 interred the relaxed waiver doctrine, *see, e.g*, *Commonwealth v. Banks*, 726 A.2d 374 (Pa. 1999), we observed in *Bronshtein* that it was not clear that the rule would be unavailable as of October 20, 1998—the date of Bronshtein's default. *See* 404 F.3d at 709-10. Because the PCRA's one-year statute of limitations "was not firmly established and regularly followed" as of that date, we held it was an inadequate state bar to federal habeas review of Bronshtein's claims. *Id*.

Applying *Bronshtein* to the present case, the District Court held that the PCRA's one-year statute of limitations was not an adequate state bar to federal habeas review of Kelvin's claims because his default had occurred, at the latest, in 1996—well before the *Bronshtein* petitioner's default. *Morris v. Beard*, No. 01-3070, 2007 WL 1795689, at *12-*13 (E.D. Pa. June 20, 2007). Indeed, the Commonwealth

11

eventually conceded that our holding in *Bronshtein* was fatal to its procedural default argument. *Id.* at \*12 n.18.

Turning to the merits of Kelvin's § 2254 petition, the District Court vacated his death sentence on June 20, 2007 after finding that Tucker had provided ineffective assistance of counsel during the penalty phase for reasons unrelated to the alleged conflict of interest at trial. *See Morris*, 2007 WL 1795689, at \*14-\*36. The Commonwealth has not appealed the decision to vacate Kelvin's death sentence. *See* Appellant's Br. at 11 n.7.

The District Court next considered what it termed Kelvin's "primary" argument: that his convictions must be vacated because Tucker's concurrent representation of Artie created an actual conflict of interest that deprived him of effective assistance of counsel at trial. *See Morris*, 2007 WL 1795689, at \*37. After reviewing the trial record, the District Court found significant evidence suggesting that Tucker's loyalties to his client Artie—together with Tucker's own financial interest in Artie's civil suit—led him to forego "the most compelling and comprehensive defense," *id.* at \*37: painting Artie as the shooter. *See generally*, *id.* at \*37-\*43. Significantly, the District Court determined that there was a causal nexus between Tucker's conflict of interest and his failure to identify Artie as the shooter before hearing Tucker's testimony in this regard. *See id.* at \*43 (holding not only that a conflict existed, but "that it adversely affected his counsel's performance").

The District Court also observed that the Commonwealth did not dispute that Tucker simultaneously represented both Kelvin and his brother Artie. *Id.* at \*39. Nevertheless, the District Court concluded that "more

12

development of the existence and scope of the attorney client relationship between [Tucker] and Artie is required before relief can be granted." *Id*. at \*43. Accordingly, the District Court exercised its discretion under 28 U.S.C. § 2254(e)(2) to hold an evidentiary hearing on that issue. *Id*. at \*44.

E

The District Court held an evidentiary hearing on October 24, 2007, and Tucker was the only witness to testify. Tucker's testimony, together with several exhibits, confirmed that he had represented Artie in a civil suit on a contingency-fee basis from September 1983 until the case was settled in August 1985.[4] This period coincided with Tucker's representation of Kelvin during his seventeen-day jury trial in November 1983. Tucker also confirmed that because the trial court was never advised of the matter, it did not conduct a colloquy on the record to determine whether Kelvin was willing to waive Tucker's conflict. Nevertheless, Tucker maintained that he had discussed the situation with both Kelvin and Artie and that both had consented to his dual representation.

---

[4] The hearing revealed that Artie's suit concerned an eye injury he received while incarcerated in a Philadelphia city jail. Artie first approached Tucker about representing him in August 1983. In September of that year, Artie, Artie's mother, and Tucker all signed a contingency-fee agreement granting Tucker 35% of any financial award or settlement Artie obtained. Artie eventually settled his suit in 1985 for $55,000, and Tucker received $19,500 in fees for his efforts.

13

Tucker also testified that he and Kelvin discussed trial strategy "extensively" both prior to and during trial. According to Tucker, Kelvin was quite protective of Artie. For that reason, Tucker explained, it was unlikely that Kelvin would have allowed him to argue that Artie was the actual shooter. Tucker further testified that he likely would have acceded to Kelvin's desire not to implicate his brother in the murder as a matter of trial strategy.

Although Tucker provided some probative testimony on direct examination by Kelvin's counsel, the Commonwealth's cross-examination proceeded in fits and starts. Each time the Commonwealth tried to probe whether, in fact, Tucker failed to identify Artie as the shooter because of his conflict of interest (or for some unrelated reason), Kelvin's counsel objected. *See, e.g.*, App. at 121-28. These objections resulted in several colloquies with the District Court regarding the scope of the evidentiary hearing. The net result was that the District Court's pre-hearing conclusion that Tucker's conflict "adversely affected" his representation of Kelvin prevented Tucker from testifying freely about that critical issue.

Based on Tucker's testimony and the record as a whole, the District Court held that Tucker's simultaneous representation of Artie and Kelvin constituted an actual conflict that led Tucker to eschew the objectively plausible alternative defense strategy of portraying Artie as the shooter. After rejecting the Commonwealth's argument that Kelvin had knowingly and intelligently waived the conflict during private conversations with Tucker, the District Court granted Kelvin habeas relief on his conflict-of-interest claim, vacated his murder conviction, and remanded the matter to state court

for a new trial. Kelvin's remaining claims were dismissed without prejudice as moot.

## II

The Commonwealth appeals, arguing that the District Court erred in three respects. First, the Commonwealth claims the District Court erred in holding an evidentiary hearing under 28 U.S.C. § 2254(e)(2) because Kelvin did not diligently develop the factual basis for his conflict-of-interest claim in Pennsylvania state court. Next, the Commonwealth argues the District Court erroneously found that Kelvin did not waive his right to conflict-free counsel. Finally, the Commonwealth attacks the merits of the District Court's conflict-of-interest analysis, arguing that Kelvin did not demonstrate that Tucker's conflict led him to avoid pursuing a plausible alternative defense strategy.

Although we review the District Court's decision to hold an evidentiary hearing for abuse of discretion, *see United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008), our consideration of the District Court's legal conclusions is plenary, *Slutzker v. Johnson*, 393 F.3d 373, 378 (3d Cir. 2004). We review any findings of fact drawn from the evidentiary hearing for clear error. *Rolan v. Vaughn*, 445 F.3d 671, 677 (3d Cir. 2006). To the extent that state court factual findings are at issue in this habeas appeal, we presume them to be correct and will disturb them only upon a showing of clear and convincing evidence to the contrary. 28 U.S.C. §2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 290 (3d Cir. 2000).

## III

We first consider the Commonwealth's contention that the District Court erred by granting Kelvin an evidentiary hearing on his conflict-of-interest claim. Our inquiry proceeds in two stages. First, we must determine whether the hearing was barred by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. If it was not, we then consider whether the District Court's decision to grant a hearing was an abuse of its discretion. We address each issue in turn.

A

Pursuant to AEDPA, district courts retain discretion to grant evidentiary hearings in federal habeas proceedings, subject to certain restrictions. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Of primary significance in Kelvin's case is 28 U.S.C. § 2254(e)(2), which generally prohibits evidentiary hearings where the petitioner "has failed to develop the factual basis of a claim in state court proceedings." Under § 2254(e)(2), "a habeas court is barred from holding an evidentiary hearing unless the petitioner was diligent in his attempt to develop a factual basis for his claim in the state court." *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *see also Williams v. Taylor*, 529 U.S. 420, 435 (2000).[5]

---

[5] Irrespective of a petitioner's diligence, a district court may also hold a hearing if the petitioner can satisfy the criteria set forth in § 2254(e)(2)(A)-(B). *See Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010). Kelvin does not rely on those subsections to support the District Court's decision to hold an evidentiary hearing in his case.

The principles of federalism and comity that underlie AEDPA in general—and § 2254(e)(2) in particular—demand that a petitioner first afford the state court a fair opportunity to develop and adjudicate his claims before seeking federal habeas relief. *See Williams*, 529 U.S. at 436-37; *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). Accordingly, whether a petitioner first pursued an evidentiary hearing in state court in the manner provided by state law is central to the diligence analysis under § 2254(e)(2). *Williams*, 529 U.S. at 437.

In this appeal, the parties agree that Kelvin sought an evidentiary hearing on his conflict-of-interest claim in state court when he filed his second PCRA petition in 1996. The state court, however, denied Kelvin a hearing and dismissed his petition without addressing its merits after deeming it untimely under the PCRA's one-year statute of limitations. Though the District Court recognized that the state court had dismissed the claim as time-barred, it reiterated its finding that the PCRA's statute of limitations was an inadequate bar to federal relief and thus concluded that Kelvin had made a sufficient attempt to develop the record in state court. Accordingly, the District Court held that § 2254(e)(2) did not bar a hearing.

Noting the lengthy delay and suspicious timing of Kelvin's conflict-of-interest claim, the Commonwealth argues that Kelvin was anything but diligent in developing his claim's factual predicate. The Commonwealth now concedes, as it must in light of *Bronshtein*, that Kelvin's conflict of interest claim is not procedurally defaulted. Nevertheless, it contends that the standard for determining whether a state procedural rule is an adequate bar to federal habeas relief is distinct from the analysis of whether a petitioner was diligent

17

in developing a particular claim under § 2254(e)(2). The Commonwealth asserts that the District Court mistakenly conflated the two analyses and held erroneously that Kelvin had been diligent in developing his conflict-of-interest claim simply because it found the PCRA's time bar inadequate. According to the Commonwealth, Kelvin's thirteen-year delay dooms his request for a hearing, regardless of whether the PCRA's statute of limitations is valid.

The Commonwealth's argument is not without force. It strains credulity to say that Kelvin "diligently" developed his conflict-of-interest claim in the traditional sense of the word. Despite knowing of Tucker's concurrent representation during his 1983 trial, Kelvin waited until 1996 to raise the issue. In doing so, he passed up numerous opportunities to make his claim; neither his post-trial motions, nor his direct appeal, nor his first PCRA petition mention Tucker's conflict. Conveniently, it was not until November 1996, just one month after Artie died, that Kelvin first claimed that Tucker's dual representation created a conflict that led him to avoid portraying Artie as the shooter.

Nevertheless, we are constrained to agree with the District Court that Kelvin was "diligent" in the technical sense that the term is used for purposes of § 2254(e)(2). As the Commonwealth points out, we observed in *Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005), that the standards for determining procedural default and diligence under § 2254(e)(2) are not coterminous. *Id.* at 665 n.10. Yet we further explained that the two standards are "analytically linked." *Id.* at 665 (citing *Williams*, 529 U.S. at 432). Thus, when "a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts . . . deny that request on the basis of an inadequate state ground, the

petitioner has not 'failed to develop the factual basis of [the] claim in State court proceedings' for purposes of §2254(e)(2)." *Id.* (brackets in original).[6]

This is precisely the scenario we confront in this appeal. As noted above, in assessing a petitioner's diligence, we focus on whether he sought an evidentiary hearing in the manner required by state law. *See Williams*, 529 U.S. at 437. Here, Kelvin did so in his second PCRA petition by raising Tucker's conflict of interest, submitting preliminary evidence on the issue, and requesting an evidentiary hearing to develop the claim further. Thus, this is not a case where the petitioner never raised the claim or never sought a hearing in state court, or where the petitioner was "given a hearing on a claim in state court but nonetheless fail[ed] to fully develop the record." *Wilson*, 426 F.3d at 665 n.10.[7] Rather, it is a case

---

[6] The Commonwealth attempts to distinguish *Wilson* by suggesting our holding there was predicated on the fact that the petitioner's untimely claim was based on newly discovered evidence. Kelvin's case is different, argues the Commonwealth, because he had the information necessary to bring his conflict-of-interest claim in 1983. We disagree because nothing in *Wilson* implies that our finding of diligence turned on the petitioner's newly discovered evidence. Rather, our decision was based on the conclusion that Wilson, like Kelvin, had been denied a state evidentiary hearing on his claim solely because of an inadequate state procedural rule. *See* 426 F.3d at 665-66. The factual distinction highlighted by the Commonwealth is thus immaterial.

[7] The Commonwealth cites *Taylor v. Horn*, 504 F.3d 416 (3d Cir. 2007), for the proposition that a state court's

19

refusal to hear a claim based on a subsequently invalidated state procedural rule does not cure a habeas petitioner's prior lack of diligence. In *Taylor*, the petitioner sought a PCRA hearing in state court on numerous claims, including a competency claim that he had already raised and for which he had already received an evidentiary hearing. *See* 504 F.3d at 436-37. The state court rejected all of the claims as procedurally defaulted.

Before this Court, the *Taylor* petitioner cited *Wilson* and argued that he had been diligent with respect to his competency claim because the state procedural rule was inadequate. We disagreed, finding the procedural grounds on which the state court rejected the claim to be inadequate only as to newly raised claims, not as to the previously litigated competency claim. *Id.* ("Taylor's competency claim had been fully litigated well before he sought to have the second PCRA court consider his new evidence [on the competency claim]. To the extent that the state procedural default of Taylor's claims was inadequate, it only bears on the claims that were new to his second PCRA petition."). Unlike the petitioner in *Taylor*, Kelvin never received a hearing on his conflict claim in state court, though he did request one. Accordingly, *Taylor* provides no support for the Commonwealth's effort to evade *Wilson*, where we stated that when "a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts . . . deny that request on the basis of an inadequate state ground, the petitioner has not 'failed to develop the factual basis of [the] claim in State court proceedings' for purposes of §2254(e)(2)." 426 F.3d at 665 (brackets in original).

where the petitioner was denied a hearing on his claim solely because the state court applied an inadequate state procedural rule.

One might argue that Kelvin's failure to comply with the PCRA's one-year statute of limitations means that he did not seek a hearing "in the manner prescribed by state law." *Williams*, 529 U.S. at 427. But such an argument runs headlong into our holding in *Bronshtein*, where we observed that the PCRA's time bar was neither "firmly established" nor "regularly followed" at the time Kelvin filed his second PCRA petition. 404 F.3d at 709-10. Because of the uncertainty surrounding Pennsylvania's use of the "relaxed-waiver rule" at that time, it was effectively impossible for Kelvin to fail to comply with Pennsylvania law on statute of limitations grounds when filing his second PCRA petition. In *Williams*, the Supreme Court explained that a finding of diligence would turn on whether a petitioner "made a reasonable attempt" to pursue his claim "in light of the information available at the time." 529 U.S. at 435. With no "firmly established and regularly applied rule" clearly barring Kelvin's lengthy delay, *Bronshtein*, 404 F.3d at 708, his belated hearing request was an acceptable attempt to pursue his claim in light of the information available to him at the time of filing. Because the Pennsylvania state courts failed to hold a hearing and rule on Kelvin's conflict-of-interest claim "for some reason unrelated to [his] diligence, § 2254(e)(2) [does] not apply and a new evidentiary hearing [is] permitted." *Taylor v. Horn*, 504 F.3d 416, 436 (3d Cir. 2007).

As the Commonwealth correctly argues, merely because a petitioner has complied with state law when seeking an evidentiary hearing does not mean that he has

been diligent for purposes of § 2254(e)(2). The jurisdictional standard for procedural default of § 2254(a) and the evidentiary hearing standard of § 2254(e)(2) are distinct provisions that will frequently require separate analyses. But where, as here, a state court gives no reason for denying a petitioner's hearing request other than his failure to comply with a subsequently invalidated state statute of limitations, we cannot say that the petitioner was not diligent for purposes of § 2254(e)(2). Accordingly, we hold that § 2254(e)(2) did not prohibit the District Court from conducting an evidentiary hearing on Kelvin's conflict-of-interest claim.

B

Whenever § 2254(e)(2) does not bar an evidentiary hearing, a district court retains discretion to conduct one, though this discretion is not unbounded. *Landrigan*, 550 U.S. at 468; *Palmer*, 592 F.3d at 393. The Supreme Court instructs that "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. We have interpreted this to require a petitioner to make a "*prima facie* showing" that "would enable [him] to prevail on the merits of the asserted claim." *Palmer*, 592 F.3d at 393. However, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief," no evidentiary hearing is required. *Landrigan*, 550 U.S. at 474.

We have little trouble concluding that the District Court's decision to hold a hearing was not an abuse of its discretion on the facts of this case. Kelvin's petition explained the circumstances of Tucker's concurrent

22

representation of Artie in the fall of 1983 and alleged a conflict of interest. As the District Court thoroughly explained, the petition's allegations, if proven, set forth a *prima facie* case for granting Kelvin habeas relief on this basis. *See Morris*, 2007 WL 1795689, at *37-*44. Moreover, once the Commonwealth's procedural default argument was dismissed, nothing in the record clearly precluded a finding that Kelvin was eligible for habeas relief.

When considering whether to hold a hearing, we have instructed district "courts [to] focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell*, 209 F.3d at 287. In the present case, it was clear that an evidentiary hearing would prove invaluable. The District Court recognized the need for further factual development of the nature and extent of the attorney-client relationship that existed between Tucker and Artie in the fall of 1983. *Morris*, 2007 WL 1795689, at *43. Specifically, it was necessary to define with precision the nature and duration of Tucker's involvement in Artie's civil suit. Furthermore, as we shall explain, critical issues of material fact remain as to whether the alternative strategy of blaming Artie for the shooting was plausible under the circumstances. For these reasons, the District Court's decision to hold an evidentiary hearing on Kelvin's conflict-of-interest claim was not an abuse of discretion.

IV

The Commonwealth next argues that the District Court erred in ordering a new trial because Kelvin waived Tucker's conflict. It is well established that where a waiver is validly made and accepted by the trial court, "the defendant may

23

[not] later successfully complain about a conflict of interest." *United States v. Moscony*, 927 F.2d 742, 749 n.10 (3d Cir. 1991) (citing *United States v. Pungitore*, 910 F.2d 1084, 1143, n.84 (3d Cir. 1990)). Less clear is what happens in situations such as this one, where counsel testified that he discussed his dual representation with his clients, but did not disclose his conflict to the trial court.

The Commonwealth argues that the absence of an on-the-record colloquy by the trial court does not automatically preclude a finding that Kelvin validly waived Tucker's conflict. It points to the federal court evidentiary hearing, where Tucker testified that he privately advised both Kelvin and Artie of the dual representation. According to Tucker, both men wanted him to continue representing them despite the conflict. The Commonwealth thus contends that Tucker's hearing testimony was sufficient to establish that Kelvin waived Tucker's conflict in spite of the fact that the state trial court never made a finding to that effect. Kelvin, on the other hand, contends that a trial court must always conduct an on-the-record colloquy for a defendant's waiver to be valid. Under Kelvin's approach, a conflicted attorney such as Tucker could never obtain a valid waiver from his client without the participation of the trial court.

We agree with the Commonwealth that the absence of an on-the-record colloquy does not automatically preclude a valid waiver of a conflict of interest. Such a colloquy is the preferred course, however, and we encourage counsel to promptly disclose to courts any conflicts of interest that might arise.

The parties also disagree regarding the burden of proof on the waiver issue. The Commonwealth argues that because

Kelvin made no objection at trial, he must prove that he did not waive Tucker's conflict. *See Iowa v. Tovar*, 541 U.S. 77, 92 (2004); *Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938) ("Where a defendant, without counsel, acquiesces in a trial resulting in his conviction and later seeks release by the extraordinary remedy of *habeas corpus*, the burden of proof rests upon him to establish that he did not competently and intelligently waive his constitutional right to assistance of counsel."). Kelvin, by contrast, argues that because the trial court made no findings as to waiver, the Commonwealth must first prove the existence of a waiver before the burden shifts to him to disprove it. *See Zuck v. Alabama*, 588 F.2d 436, 440 (5th Cir. 1979) ("[I]f the record is silent on whether the defendant received the information required [to obtain a valid waiver] . . . then the State must bear the burden of showing that the waiver was knowing and intelligent.").

Even assuming, *arguendo*, that the Commonwealth is correct that Kelvin bears the burden of proof on this issue, he has cited ample evidence from the federal evidentiary hearing to support the District Court's finding that he did not knowingly and intelligently waive his right to conflict-free counsel. Any waiver of the Sixth Amendment right to conflict-free counsel "must be made knowingly, intelligently, and with awareness of the likely consequences of the waiver." *United States v. Dolan*, 570 F.2d 1177, 1180-81 (3d Cir. 1978). A waiver is made "knowingly" and "intelligently" only if the "defendant is aware of the foreseeable prejudices his attorney's continued representation could entail for his trial, and possible detrimental consequences of those prejudices." *Id*. at 1181; *see also United States v. Laura*, 667 F.2d 365, 371 (3d Cir. 1981). The record of the evidentiary

25

hearing demonstrates that Kelvin was not provided with the information he needed to make a valid waiver.

At the hearing, Tucker merely testified that he "spoke" with both Kelvin and Artie about his concurrent representation and that both wanted him to continue as their attorney. App. at 138-39. Unfortunately, Tucker's vague testimony sheds no light on the content of his waiver discussions with Kelvin. Nowhere does the record suggest, for example, that Tucker advised Kelvin of the negative consequences that might flow from the conflict. *See United States ex rel. Hart v. Davenport*, 478 F.2d 203, 211 (3d Cir. 1973) (holding a defendant may waive counsel's conflict as long as the dangers inherent in joint representation are explained). Nor is there any suggestion that Kelvin was made aware of his right to obtain new counsel due to Tucker's conflict. Finally, and most significantly, Tucker also suggested that he did not perceive his dual representation of Kelvin and Artie to present a conflict of interest at the time. App. at 127. Like the District Court, we question whether an attorney who admittedly did not understand or appreciate the magnitude of his conflict could adequately convey the information necessary for his client to make an informed waiver. *See Wheat v. United States*, 486 U.S. 153, 163 (1988) ("Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relationship to the care with which he conveys all the necessary information to them."). For all the foregoing reasons, we agree with the District Court that Kelvin was deprived of the opportunity to make a knowing and intelligent

waiver of his Sixth Amendment right to conflict-free counsel.[8]

V

We turn finally to the merits of Kelvin's conflict-of-interest claim. Because Kelvin did not object at trial, he must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)) (internal quotation marks omitted). If Kelvin can make this showing, he "need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349-50; *Morelli*, 169 F.3d at 810.

As we noted previously, before holding an evidentiary hearing, the District Court concluded that Tucker's conflict (assuming he had one) adversely affected his representation. Accordingly, the evidentiary hearing was held merely to determine whether an attorney-client relationship existed between Tucker and Artie during the time in question. At that hearing, Kelvin's counsel established, in a mere seven pages of transcript, that Tucker represented Artie at the relevant time before turning the witness over to the Commonwealth for cross-examination. Presumably because of Tucker's unassailable testimony regarding the existence of his attorney-client relationship with Artie, the Commonwealth

---

[8] For this reason, the Commonwealth's reliance on *United States v. Laura*, 667 F.2d 365 (3d Cir. 1981), is misplaced. In stark contrast to this case, the dangers of joint representation were explained to Laura in open court, allowing "the trial court . . . to evaluate whether [her] waiver was knowing, intelligent, and voluntary." *Id.* at 371.

27

embarked on a line of questioning intended to establish that this actual conflict of interest had no bearing on Kelvin's trial. Because of the District Court's previous ruling regarding adverse effect, however, the Commonwealth was precluded from developing the record in any meaningful way in this regard. As we shall explain, this procedural misstep requires us to vacate and remand the case for a new evidentiary hearing.

After cataloguing the evidence implicating Artie, the District Court found the strategy of identifying him as the shooter to be an objectively plausible alternative defense. The District Court then concluded that Tucker avoided this strategy solely because of his loyalties to Artie and his own financial stake in Artie's civil suit. To the District Court, it was clear that Tucker's actual conflict adversely affected his handling of Kelvin's trial. We are not so sure.

Considered in the abstract, blaming Artie for the murder was surely a plausible alternative defense strategy. Although the Commonwealth's case centered largely on eyewitness identifications of Kelvin, other evidence pointed to Artie as the shooter. Flowers, for example, never wavered from his initial identification of Artie, even when shown a photo array that included pictures of both brothers. And Linaberry—whose testimony was central to the Commonwealth's case—also initially identified Artie. Finally, the composite sketch that police drew after speaking with Johnson portrayed a suspect with a damaged eye similar to Artie's. When viewed together, this evidence was more than sufficient to support an argument that Artie was the shooter.

Furthermore, it would be reasonable to infer that Tucker avoided this alternative defense because of his loyalty to Artie and his financial stake in Artie's civil case. As an initial matter, common sense suggests that an attorney would be wary of alienating a client with a potentially lucrative civil rights claim by accusing him of murder in open court. And as the District Court noted, Tucker testified that he never sought to investigate Artie's alibi, motive, or opportunity to commit the crime. Moreover, Tucker took actions at trial that could be construed as protecting Artie—for example, he objected when the Commonwealth asked Linaberry to name the person he initially identified and sought to prevent the admission of the composite sketch that portrayed a man with a damaged eye that resembled Artie.

Notwithstanding this evidence, the present record leaves us unable to determine whether Kelvin has carried his burden of demonstrating that Tucker's conflict, in fact, adversely affected his representation. At the hearing, Tucker recalled that Kelvin was quite protective of Artie. App. at 139. Accordingly, Tucker suggested Kelvin would not have allowed him to portray Artie as the shooter at trial. App. at 127, 139. Specifically, when asked if he would have accused Artie of the murder at trial, Tucker stated: "it may have . . . come to the point I would not do that based on what [Kelvin's] position was regarding Artie." App. at 139. And when pressed on whether he would have permitted Kelvin's interest in protecting his brother to dictate trial strategy, Tucker replied: "I probably would have favored [Kelvin's] wishes, especially involving [his] brother." App. at 146. Finally, Tucker repeatedly suggested that if pointing the finger at Artie had been a viable strategy, he would have withdrawn from one of the representations. App. 128, 149.

Tucker's failure to withdraw from either case suggests that accusing Artie of being the shooter was not, in fact, a viable strategy.

The significance of this testimony is twofold. First, it raises a serious question as to whether portraying Artie as the shooter was a plausible alternative defense strategy in light of Kelvin's apparent unwillingness to accuse his brother of murder. To show that the proffered alternative strategy was plausible, Kelvin must demonstrate "that it possessed sufficient substance to be a viable alternative." *Morelli*, 169 F.3d at 810. However, it would be illogical to say that a defense theory presented a "viable alternative" where the defendant expressly forbade his attorney from pursuing it. The evidence of Kelvin's hesitancy causes us to question whether the strategy of accusing Artie was "not undertaken due to [Tucker's] other loyalties or interests." *Morelli*, 169 F.3d at 810 (citing *United States v. Gambino*, 864 F.2d 1064, 1070-71 (3d Cir. 1988)). Moreover, the fact that a defense witness (William Meekins) testified that the perpetrator looked nothing like Kelvin and another defense witness (Lamont Bruce) testified that three younger men committed the shooting, suggests that it would have been against Kelvin's interest to point the finger at someone (Artie) who strongly resembled him.

Simply put, Kelvin must show that Tucker's conflict adversely affected his representation. Tucker's unduly truncated testimony at the evidentiary hearing raises serious questions as to whether Kelvin's reticence and/or strategic considerations consistent with Kelvin's best interests—rather than Tucker's conflict of interest—led Tucker to avoid accusing Artie of the shooting. *See Gambino*, 864 F.2d at 1070-71 ("On the other hand, there is no conflict of interest

30

adversely affecting the attorney's performance if an attorney at trial does not raise a defense on behalf of his client because to do so is not in that client's interest even though it is also in the interest of another client that it not be raised. To the contrary, that is a coincidence of interests.").

Proper evaluation of Kelvin's conflict claim thus requires more information than the present record provides regarding the reason Artie was not implicated in the crime. If Kelvin's antipathy to implicating his brother was sufficiently strong, it could render the theory implausible. *Cf. Winkler v. Keane*, 7 F.3d 304, 309-10 (2d Cir. 1993) (holding plea bargaining was not a plausible alternative strategy where the defendant explicitly stated that he was not interested in a plea and instead "asserted" and "insisted" on his innocence to defense counsel). If the facts show that Kelvin's wishes and his communications with counsel would have led reasonable counsel to understand that Kelvin would never agree to implicate Artie, then doing so could not have been a "plausible alternative" defense. On the other hand, if the facts were such that reasonable counsel would have at least attempted to persuade Kelvin of the wisdom of that strategy, that approach could have been a "plausible alternative" defense. Finally, Tucker may have decided not to identify Artie for legitimate strategic reasons in light of the family resemblance between Kelvin and Artie. We leave these issues—as well as any other issues the District Court might identify in light of this opinion—for review on remand to the District Court.

VI

For all the foregoing reasons, we will affirm the District Court's decision to conduct an evidentiary hearing on

Kelvin's conflict-of-interest claim. We will likewise affirm the District Court's holding that Kelvin did not waive his Sixth Amendment right to conflict-free counsel. We will vacate the District Court's order for a new trial, however, and remand the matter for the District Court to conduct a plenary evidentiary hearing consistent with this opinion.