NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-3146
_____

STEPHEN M. HARMER,

Appellant

v.

SUPERINTENDENT FAYETTE SCI;
THE DISTRICT ATTORNEY OF THE COUNTY OF LANCASTER;
THE ATTORNEY GENERAL OF THE COMMONWEALTH OF
PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-18-cv-00175)
District Judge:  The Honorable Mark A. Kearney
_____

Submitted under Third Circuit L.A.R. 34.1(a)
March 12, 2021

Before: SMITH, *Chief Judge*, McKEE and AMBRO, *Circuit Judges*

(Filed: August 12, 2021)

_____

OPINION[*]
_____

SMITH, *Chief Judge*.

Appellant Stephen Harmer petitioned for a writ of habeas corpus, alleging that his trial counsel labored under a conflict of interest that adversely affected counsel's performance. We will affirm the District Court's denial of habeas relief.

## I.    BACKGROUND

In August 2012, Cody and Kyle Wunder broke into the home of a Pennsylvania widower, Douglas Herr, to steal about $200,000 from his safe. Harmer told the brothers about the cash in the safe, knew the area, drove them to the house, and waited in the getaway car. The crime turned grisly when Herr, who was armed, confronted the brothers. Kyle struck Herr with the butt of his shotgun, rendering him unconscious. At some point, Cody realized that he had been shot, and Kyle, in turn, shot and killed Herr. The brothers escaped with the cash and were arrested along with Harmer in September 2012. All three were charged with burglary, robbery, and murder as well as conspiracy to commit the same. While Kyle was charged with first-degree murder, Cody and Harmer were charged with second-degree (or felony) murder.

On September 6, 2012, attorney Christopher Lyden was appointed to represent Cody. Lyden billed for ninety dollars' worth of legal work on Cody's case, including 1.5

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

hours of legal research and phone calls. Lyden did not appear in court on behalf of Cody, nor did Lyden talk to him (by phone or in person). In early October, Cody hired private counsel but Lyden's name continued to appear on the criminal docket as Cody's counsel of record.

In October, Harmer's family contacted Lyden about representing him in the case. Lyden met with Harmer, who went on to hire him to handle the criminal case for a fixed fee of $15,000. Then, in December 2012, Lyden received a notice copy of the criminal information under which Cody was charged. Lyden instructed a court official to remove his name as Cody's counsel of record.

Both Wunder brothers provided statements about the murder in April 2013 and, in July, entered into plea agreements with the Commonwealth under which they consented to life-without-parole sentences. One condition of Cody's plea was that Kyle, who pleaded to first-degree murder, be spared the death penalty. Another was that Cody testify truthfully for the Commonwealth at Harmer's trial.

Harmer went to trial in August 2013. The defense's theory of the case was that, though guilty of the lesser charges, Harmer could not be convicted of felony murder because Kyle's shooting of Herr was not in furtherance of the agreed-upon robbery.[1] Instead, it was a detour of personal retaliation—committed *after* the brothers had left the house with the cash—and purely because Cody had been shot. In the defense's case in

---

[1] Harmer could only be guilty of second-degree (felony) murder if Kyle committed the murder in furtherance of the robbery. *See Commonwealth v. Redline*, 137 A.2d 472, 476 (Pa. 1958).

chief, Lyden called Kyle as a witness to establish this factual sequence. After Kyle invoked the Fifth Amendment, Lyden then played for the jury a recorded post-arrest interview in which Kyle stated that he had gone back inside the house and killed Herr after he and Cody had left the house with the money.[2]

The jury believed Cody. He had testified for the Commonwealth that he told Kyle to shoot Herr *before* they left the house to neutralize him as a threat. Lyden cross-examined his former client Cody briefly, in testimony occupying just five transcript pages. Besides highlighting how Cody's plea deal took the death penalty off the table for his brother, Lyden sought to elicit that Cody was an unreliable narrator of how Herr was killed because Cody had just been shot, his perception distorted by shock and adrenaline. The jury ultimately convicted Harmer of second-degree murder as well as the other crimes he did not contest, and he was thus sentenced to mandatory life without parole.

Lyden handled Harmer's direct appeal, though Harmer's family paid an appellate lawyer $5,000 essentially to look over Lyden's shoulder. The appellate court affirmed Harmer's conviction and mandatory life sentence, and the Pennsylvania Supreme Court denied review. Harmer then sought relief under the Post-Conviction Relief Act, 42 Pa. C.S.A. §§ 9541–9546 ("PCRA"). In a counseled petition, he argued that Lyden had been ineffective in failing to request an accomplice liability instruction for Cody's testimony and in not moving to exclude other bad acts evidence, including testimony that Harmer had

---

[2] Kyle apparently also told others in the wake of the murder, "What was I supposed to do? He shot my brother." JA62. (Citations preceded by "JA" refer to the parties' Joint Appendix submitted on appeal.)

sold and consumed illegal drugs. *See Commonwealth v. Harmer*, No. 1642 MDA 2016, 2017 WL 2615898, at *1–2 (Pa. Super. Ct. June 16, 2017). The PCRA court dismissed Harmer's petition following a hearing, and the appellate court affirmed. *See id.* The Pennsylvania Supreme Court denied Harmer's petition for review.

In January 2018, Harmer filed a pro se habeas petition in the Eastern District of Pennsylvania. Upon retaining counsel, he filed a supplemental petition arguing for the first time that Lyden had a conflict of interest in representing Harmer after previously representing Cody in the same case.[3] The magistrate judge heard testimony at two evidentiary hearings, including from Harmer, his PCRA counsel, Lyden, and the lead prosecutor in Harmer's criminal case. Lyden testified that, because he never had contact with Cody, he did not consider Cody to have been his client. Yet at the same time, Lyden maintained that he disclosed his prior representation of Cody to Harmer before the trial.

The magistrate judge found that Lyden's testimony on these points was not credible but recommended denial of habeas relief because there was no evidence that any conflict adversely affected Lyden's trial performance. The District Court agreed with the bulk of the magistrate judge's Report & Recommendation and denied relief. But the District Court noted that the magistrate judge, in resolving the question of adverse effect, should have independently considered whether there was an inherent conflict between plausible trial strategies that Lyden bypassed and his duties to Cody. It issued a certificate of

---

[3] Given belated discovery of the September 2012 order appointing Lyden to represent Cody, the magistrate judge excused Harmer's default in not raising the conflict claim in his PCRA petition, citing *Martinez v. Ryan*, 566 U.S. 1 (2012).

appealability, which we later clarified by framing the issue as whether the District Court erred in its adjudication of Harmer's Sixth Amendment claim that Lyden labored under a conflict of interest.[4]

## II.    DISCUSSION[5]

Both sides agree that the standard set out in *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980), and *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988), applies here.[6]  That standard requires a habeas petitioner to prove that (1) an actual conflict of interest existed and (2) the conflict adversely affected the adequacy of representation. *Sullivan*; 446 U.S. at 349–50; *Gambino*, 864 F.2d at 1070.  An actual conflict "is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action."  *Gambino*, 864 F.2d at 1070 (quotation omitted).  And adverse effect turns on whether "some plausible alternative defense strategy or tactic might have been pursued" that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *Id.* (quotation omitted).

---

[4] We review the District Court's legal conclusions de novo.  *Morris v. Beard*, 633 F.3d 185, 193 (3d Cir. 2011).  We review the District Court's findings of fact for clear error.  *Id.* (citation omitted).  The PCRA court did not adjudicate the conflict claim on the merits, so the limitations on relief in 28 U.S.C. § 2254(d) do not apply.

[5] The District Court had jurisdiction over Harmer's habeas petition under 28 U.S.C. § 2254.  Because the District Court granted a certificate of appealability, we have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253.

[6] We therefore assume without deciding that *Sullivan* applies in cases of successive representation.

Harmer argues that Lyden's conflict of interest adversely affected his trial performance because he bypassed three plausible defense strategies that inherently conflicted with his duties to former client Cody.[7]  First, Lyden failed to vigorously pursue more favorable plea terms for Harmer.  Second, he opted not to request an accomplice jury instruction that would have discounted Cody's credibility.  Third, he decided not to adduce evidence of Harmer's non-violent character.  But the first was not a plausible strategy.  And the facts show that the second and third neither inherently conflicted with nor were foregone due to Lyden's other loyalties.

Harmer first contends that Lyden failed to secure a plea for him because doing so would have dented Cody's chances of securing his own deal.  A defendant "alleging that his attorney's conflict of interest prevented the exploration of plea negotiations" must "demonstrate that the government was willing to extend, or consider, an invitation to commence plea negotiations." *Moss v. United States*, 323 F.3d 445, 465 (6th Cir. 2003); *accord Holloway v. Arkansas*, 435 U.S. 475, 490 (1978).  But the prosecutor made clear to Lyden that the Commonwealth was unwilling to consider any deal for Harmer of less than life imprisonment without the possibility of parole because Harmer was "the catalyst" for the robbery, was as culpable as the Wunder brothers due to his role in orchestrating it, and had given a self-serving counseled statement to law enforcement.  JA389-94, JA423.  Undeterred, Harmer argues that Lyden should not have taken that position at face value

---

[7] We assume without deciding that Lyden's prior representation of Cody created an actual conflict of interest.

but, for example, should have gone above the prosecutor's head to the District Attorney or offered Harmer as a cooperating witness against the Wunders before they pleaded guilty.[8]

Yet Lyden testified that he did speak with the prosecutor several times, not just once, about the prospect of a plea deal for Harmer. Corroborating this, the prosecutor "confident[ly]" recollected multiple "discussions" with Lyden about resolving the case. JA400, 423. And Lyden testified, unrebutted, that he floated to Harmer the idea of providing more information about the case to entice the Commonwealth to reconsider its stance. Nothing ever came of it. It would be one thing if Lyden had never tried to plea bargain, particularly if the Commonwealth had been receptive to a plea deal for Harmer. But the record suggests otherwise. *Cf. Burger v. Kemp*, 483 U.S. 776, 785–86 (1987) ("The notion that the prosecutor would have been receptive to a plea bargain is completely unsupported in the record."). More dogged pursuit of a plea deal for Harmer was thus not "a viable alternative" to going to trial. *Gambino*, 864 F.2d at 1070 (quotation omitted).

Harmer next challenges Lyden's failure to request an instruction under which the jury would discount Cody's testimony because, as an accomplice to the crime, he was a "polluted source." Appellant's Br. 42 (quoting *Commonwealth v. Chmiel*, 639 A.2d 9, 13 (Pa. 1994)). Harmer claims that Lyden's former client Cody would have viewed any request for such an instruction as a betrayal. Although requesting that instruction was a plausible defense strategy,[9] the facts belie Harmer's claim that doing so inherently

---

[8] Harmer did not contemporaneously ask Lyden to pursue further plea talks.

[9] Lyden testified at Harmer's habeas evidentiary hearing that he did not request an accomplice instruction because it did not directly relate to his defense theory that the

conflicted with Lyden's duties to Cody. Lyden undermined Cody's credibility in other ways. For example, on cross-examination, Lyden sought to adduce Cody's bias and untrustworthiness, including by asking him about his plea deal and his lying to police. Harmer cannot explain why this questioning did not inherently conflict but failing to request the instruction did. And the same facts defeat any argument that Lyden failed to request the instruction "due to" his other loyalties or interests. *Gambino*, 864 F.2d at 1070.

Harmer finally claims that Lyden chose not to present evidence of Harmer's non-violent character because doing so would have increased the chances of his acquittal of felony murder, thus jeopardizing Cody's plea deal. But that argument effectively seeks a per se rule for successive representations: Any trial strategy conceivably beneficial to a defendant inherently conflicts with his lawyer's duties to a former client who, as a condition of pleading guilty, testified against him. At least on these facts, we decline to adopt such a rule. Not only was the former representation *de minimis,* but at trial Lyden contrasted Cody and Kyle, whom he called "cold-blooded killers," with Harmer, whom he argued "did not participate in any way in the decision to kill." JA63. Evidence at trial also showed that, when discussing the planned robbery, Harmer expressed a desire that no one be killed. Given Lyden's emphasis at trial on Harmer's non-violent role, Harmer fails to persuade us that the added step of proving his non-violent character was either inherently

recorded interview of Kyle, the shooter, was more credible than the trial testimony of Cody, who had been shot, about the sequencing of Herr's murder.

in conflict with or "not undertaken due to [Lyden's] other loyalties or interests." *See Gambino*, 864 F.2d at 1070 (quotation omitted).

### III.   CONCLUSION

For the reasons stated, we will affirm the judgment of the District Court.