**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3006
_____

JOSEPH WALLACE,
Appellant

v.

SUPERINTENDENT MAHANOY SCI;
ATTORNEY GENERAL PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-15-cv-05376
District Judge:  The Honorable Jeffrey L. Schmehl
_____

Argued March 9, 2021

Before: SMITH, *Chief Judge*, McKEE, and AMBRO,
*Circuit Judges*

(Filed: June 22, 2021)

Federal Public Defender
Western District of Pennsylvania
Lisa B. Freeland
Samuel G. Saylor        [ARGUED]
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
        *Counsel for Appellant*

Nicholas J. Casenta, Jr.    [ARGUED]
Chester County Office of the District Attorney
Suite 4450
201 West Market Street
P.O. Box 2746
West Chester, PA 19380
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

SMITH, *Chief Judge*.

More than twenty years ago, Joseph Wallace pleaded guilty but mentally ill (GBMI) to third-degree murder and related crimes. This appeal concerns his petition for a writ of habeas corpus that was due by

2

January 7, 2002, but which he did not file until September 13, 2015. He asks us now to excuse his decade-plus delay in filing the petition.

For much of his life, if not all of it, Wallace has suffered from severe mental illness, including bipolar disorder with psychotic features, chronic depression, attention deficit hyperactivity disorder, and major affective disorder; his illness has manifested at times as hallucinations, religious delusions, manic activity, and suicidal tendencies. It is undisputed that an acute psychotic episode led him to commit the crime for which he remains incarcerated today. Wallace contends that his mental illness so hampered his ability to think clearly that he could not reasonably have been expected to file for federal habeas relief at any time prior to September 2015. But after a painstaking review of the record, we cannot agree. Instead, we conclude that Wallace has not demonstrated his entitlement to equitable tolling that would allow us to extend the filing deadline for the duration of the period of excessive delay the record reveals.

In addition, Wallace claims that his prescribed use of the prescription drug Ritalin[1] may have exacerbated his

---

[1] Ritalin is the brand name for methylphenidate hydrochloride, a "mild central nervous system stimulant"

3

psychosis, rendering him involuntarily intoxicated or legally insane at the time of his crime such that he could not form the *mens rea* necessary for murder. But given the applicable law and the evidence of record, we are not persuaded that this claim permits Wallace to employ the narrow "actual innocence gateway," *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), to excuse him from the filing deadline for habeas petitions set forth in 28 U.S.C. § 2244.

We will affirm the District Court's judgment dismissing Wallace's habeas petition as untimely.

## I.  FACTUAL BACKGROUND[2]

On February 28, 2000, Wallace was in the throes of a severe psychotic episode. Early that morning, after a sleepless night, he got into bed with his wife, Eileen. Wallace was clutching a knife. After waiting ten or fifteen

---

used to treat Attention Deficit Hyperactivity Disorder (ADHD) and narcolepsy. JA 327–28.

[2] The factual background and procedural history have been drawn from the contents of the appendix provided by the parties. The salient facts are largely undisputed. However, portions of the record appear to be missing or incomplete, likely due to the lengthy interval between Wallace's underlying criminal proceeding and the current habeas proceeding,

minutes to build up his courage, Wallace used the knife to stab Eileen in the chest as she lay sleeping. She awoke, pleaded with him to stop, and tried to fight him off. They struggled for a few minutes while Wallace continued to stab and slash at her. Eileen soon died from her wounds.

Wallace then showered, changed his clothes, stowed the knife in a drawer, and locked the door to their house, leaving Eileen's body behind. Then he left for a convenience store. Later, Wallace took a train to Philadelphia where he planned to commit suicide. Police were waiting for him, however, after his mother disclosed his whereabouts. They apprehended him in Philadelphia's Thirtieth Street train station.

Meanwhile, Patricia Daniels, began to worry when her friend, Eileen, missed a scheduled appointment. Daniels contacted the police and asked for a "well-being check" at the Wallaces' home. JA 1150.[3] A responding officer discovered the doors were locked, and when no one answered, he entered forcefully by breaking a windowpane. Daniels accompanied the officer inside where they discovered Eileen's body upstairs.

The next day, while in police custody, Wallace admitted to stabbing his wife to death. He told police that he had acted on a belief that Eileen's death would put her

---

[3] JA refers to the parties' Joint Appendix.

5

out of her misery and set her spirit free. As he related his account, he appeared mild, calm, and subdued to the officers who interviewed him.

Several months later, Wallace explained to a doctor that he had killed Eileen because he had believed that he and she, together, "were Jesus," JA 253, and that "he was doing her a favor by killing her" because "she is in heaven" and "it was the right thing for her," JA 256. He then explained that he left the scene because he knew the police would be looking for him.

Around the time of the crime, Wallace had been taking prescription medications including Ambien, Paxil, and Ritalin. Later, he claimed to doctors that he did not remember precisely which medications he took on the day of Eileen's death.

## II. PROCEDURAL HISTORY

### A. *Wallace's Pennsylvania Criminal Proceeding*

Wallace was charged in the Court of Common Pleas of Chester County with first-, second-, and third-degree murder, 18 Pa C.S. § 2502,[4] aggravated assault, 18 Pa. C.S.

---

[4] Under 18 Pa C.S. § 2502(a), first-degree murder is a criminal homicide "committed by an intentional killing." An intentional killing is killing "by means of poison, or by

§ 2702(a)(1), (4), possession of an instrument of crime, 18 Pa. C.S. § 907(a), and tampering with evidence, 18 Pa. C.S. § 4910(1).[5] The case was assigned to Judge James P. MacElree, III. First Assistant Public Defender Graham Andes, Esq., represented Wallace. At that time, Andes was a twenty-seven-year veteran of the Chester County public defender's office and was that office's specialist in mental health defenses. Andes was assisted by co-counsel Maria Heller, Esq.

In March 2000, Andes directed two forensic psychologists, Dr. Gerald Cooke and Dr. Robert Sadoff, to examine Wallace and opine on his mental competence. Both doctors concluded that Wallace was competent to attend a preliminary hearing but that he would need to be re-evaluated as to his competence to stand trial.

In June 2000, Andes requested Drs. Sadoff and Cooke to re-evaluate Wallace by conducting

---

lying in wait, or by any other kind of willful, deliberate and premeditated killing." § 2502(d). Second degree murder is a criminal homicide "committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." § 2502(b). Third degree murder is "[a]ll other kinds of murder." § 2502(c).

[5] The tampering charge arose from Wallace's having placed the murder weapon into a drawer.

psychological testing and reviewing his medical records. Andes sought comprehensive written opinions assessing both Wallace's competence to stand trial and his state of mind at the time of the crime. In response, Dr. Cooke reported that Wallace was, at the time of the evaluation, in partial remission due to his medication regime. Dr. Cooke adjudged him "marginally competent to stand trial," but suggested re-evaluation "a day or two prior to" trial to assess whether the stress of an approaching trial could cause him to decompensate. JA 999. As to state of mind at the time of the crime, Dr. Cooke opined that Wallace was not legally insane but satisfied Pennsylvania's GBMI[6] definition:

> Wallace was overtly and grossly psychotic at the time of the offense, and . . . his actions followed from a psychotic delusion. If not for his psychosis, it is my opinion that this offense would not have occurred. **It is also**

---

[6] "A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found 'guilty but mentally ill' [GBMI] at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense." 18 Pa. C.S. § 314(a).

8

**my opinion that because of his psychosis he could not conform his behavior to the requirements of law and therefore he would meet the criteria for Guilty but Mentally Ill**. However, though he believed that he was acting based on a higher law, **he did know that by Man's law what he did would be viewed as wrong, and that the police would come looking for him. Therefore, it is my opinion that he does not meet the stricter M'Naughten standard for Insanity**. . . . **[I]t is my opinion that Mr. Wallace acted without malice.** Rather, based on his delusions, he felt he was freeing his wife from an evil world and sending her to heaven.

JA 1000 (emphases added).

Dr. Sadoff reached essentially the same conclusions as had Dr. Cooke. Sadoff opined in a June 2000 report that Wallace was "currently mentally competent to proceed." JA 983. In addition, Sadoff concluded that Wallace stabbed his wife "with a benevolent intent and without malice, *i.e.*, without the intent to harm her, but rather to help her get out of the misery of this world." JA 982. But Dr. Sadoff went on to opine that Wallace was not insane and instead met the definition for GBMI:

9

> **Mr. Wallace knew that he was stabbing his wife and knew that it was against the law. His behavior indicates that he wanted to avoid the police and knew that taking another's life was against the law. Thus**, he does not fit the McNaughten rule for insanity in Pennsylvania. With respect to diminished capacity, Mr. Wallace **had the ability to form the intent to kill his wife, which is what he intended to do, and carried out his intention,** so there is no diminished capacity. However, **Mr. Wallace, in my opinion, lacked substantial capacity to conform his conduct to the requirements of law, which is one of the definitions for mentally ill in the legal concept of "guilty but mentally ill."**

JA 982–83 (emphases added).

On June 7, 2000, the trial court held a status hearing during which Andes indicated that the doctors had found Wallace competent to proceed, and Wallace himself agreed with their assessment.[7] In an abundance of caution,

---

[7] Andes disclosed to the trial court that Wallace had requested the death penalty for himself (despite the fact that the Commonwealth was not seeking the death

10

the trial court conducted a second arraignment to ensure that there was no question of Wallace being competent for the arraignment process. While Wallace stood mute, Andes entered a plea of not guilty on his client's behalf as to all counts. Trial was tentatively set for late September 2000.

In the fall of 2000, Andes moved to recuse Judge MacElree as trial judge, arguing that the Judge had displayed an appearance of bias against mental health defenses based on statements made in Wallace's case. On September 26, 2000, oral argument on the recusal motion was held before Senior Judge John Backenstoe of Lehigh County. Andes argued that "there is no defense in this case but a mental health defense" but observed that, "based on the psychological/psychiatric reports that [he had] received from [the] experts, there [was] almost no chance of a finding of not guilty by reason of insanity." JA 1057. Thus, he anticipated that the case before the jury would focus on GBMI. Andes also observed that there was little record evidence to support a finding of malice, apart from the inference that would arise from the use of a deadly weapon to a vital part of the victim's body. JA 1059.

penalty) and that the doctors had considered that fact when conducting their competency assessments.

11

Judge Backenstoe ultimately denied the disqualification motion and the matter continued before Judge MacElree.

On November 9, 2000, Judge MacElree conducted an evidentiary hearing on a motion to suppress. Andes reiterated at that time that he planned to present both the insanity and GBMI defenses. He stated, "[w]e have taken the position that even though our doctors do not indicate that [Wallace] was M'Naughten insane, that this should be presented to a jury." JA 1232. Andes noted that the Commonwealth's doctors were still examining Wallace and had yet to determine whether they viewed him as insane. Trial was re-scheduled to mid-December.

Later that November, the Commonwealth's expert, psychiatrist Timothy J. Michals, examined Wallace, conducted psychological testing, and reviewed his medical records.[8] Dr. Michals concluded that Wallace was competent to proceed to trial. He further concluded that, in killing Eileen, Wallace had acted with malice as defined under Pennsylvania law:

---

[8] Dr. Michals's report indicates that forensic psychologist Dr. Steven Samuel also examined Wallace and prepared a report. The record reflects that a transcript was prepared of the examination that Drs. Samuel and Michals conducted. Neither Samuel's report nor the examination transcript appears in the record.

[I]t is my opinion that Mr. Wallace knew that the stabbing and other injuries that he had inflicted on his wife were wrong and would cause her physical death.

**It is my understanding that malice is defined as, ". . . first, an intention to kill, or second, an intent to inflict serious bodily harm, or third, (a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life) (a conscious disregard of an unjustified and extremely high risk that his actions might cause death or serious bodily harm).["]**

**It is my opinion that Mr. Wallace's killing of his wife was done with malice.** Secondly, it is my opinion that he intended to inflict serious bodily harm. Thirdly, it is my opinion, based on the review of the autopsy and the photographs of Mrs. Wallace, that Mr. Wallace acted with wickedness of disposition, hardness of the heart, cruelty and

13

> recklessness in taking his wife's life and **this was not a benevolent killing.**

JA 1448 (emphases added).

At around the same time as Dr. Michals's examination, defense counsel asked Drs. Cooke and Sadoff to revisit their views on Wallace's state of mind. Dr. Sadoff reiterated that his opinion had not changed since the June 2000 evaluation. Dr. Cooke similarly restated his earlier opinion "that the actions that comprised the offense would not have occurred but for Mr. Wallace's grandiose psychotic delusions, and that because he acted out these delusions believing that what he was doing was out of love and right in the eyes of God, he acted without malice." JA 312.

After months of trial preparations, on December 6, 2000, Wallace entered a plea agreement with the Commonwealth. He pleaded GBMI to third-degree murder, possession of an instrument of crime, and tampering with evidence.[9] Judge MacElree sentenced Wallace to a term of 23½ to 47 years' imprisonment.

---

[9] Due to the long lapse of time between Wallace's guilty plea and initiation of post-conviction proceedings, the tape recordings that were necessary to prepare a transcript of

14

Wallace did not take a direct appeal.

B. *Wallace's Pennsylvania PCRA Proceeding*

In the fall of 2012, Wallace spoke to a prison doctor who expressed a suspicion that Wallace may have been legally insane at the time of the murder. Wallace's treatment team began encouraging him to pursue legal remedies, and they put him in touch with a fellow inmate who could assist him with legal filings. With that assistance, on September 3, 2013—nearly a decade and a half after he entered his guilty plea—Wallace filed a pro se petition for post-conviction relief under Pennsylvania's Post-Conviction Relief Act (PCRA). In it, Wallace proposed a new theory to explain his violent actions in February of 2000: that consuming Ritalin may have caused the psychotic episode that led him to kill Eileen. He also raised a number of related claims, including actual innocence based on insanity and involuntary intoxication caused by Ritalin and ineffective assistance of counsel for failing to adequately investigate the Ritalin theory or a legal insanity defense.

The PCRA Court appointed Robert P. Brendza, Esq., to represent Wallace. On October 31, 2013, Brendza

the plea hearing had been destroyed. Accordingly, no plea hearing transcript appears in the record.

15

filed a no-merit letter and moved to withdraw from the representation on grounds that Wallace's PCRA petition was untimely filed. *See* 42 Pa. C.S. § 9545(b)(1) (providing that a PCRA petition is due one year after the date the judgment becomes final). On September 24, 2014, the PCRA Court agreed. The PCRA Court rejected Wallace's claim that the petition's untimeliness should be excused based upon "newly discovered facts" under 42 Pa. C.S. § 9545(b)(1)(ii) (requiring that the facts upon which the petition is based "were unknown to the petitioner and could not have been ascertained by the exercise of due diligence"). The court observed that "[t]he 'new facts' asserted by defendant, including his claim of involuntary intoxication by prescription medication, were not new, rather they were different iterations of an old issue, defendant's mental health at the time he killed his wife." JA 71 n.1. The PCRA Court therefore dismissed the petition as untimely and granted counsel's motion to withdraw.

Wallace appealed. On November 25, 2014, the Superior Court affirmed the PCRA Court's dismissal. The Superior Court agreed with the PCRA Court that Wallace's Ritalin-related claims "are not [based on] newly discovered facts but merely a newly willing source for previously known facts." JA 79 (citation omitted, cleaned up).

16

On July 29, 2015, the Pennsylvania Supreme Court denied Wallace's petition for allowance of appeal. *See Commonwealth v. Wallace*, 119 A.3d 351 (Pa. 2015).

## C. *Wallace's Federal Habeas Proceeding*

On September 29, 2015, Wallace filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In it, he raised claims similar to those raised in his 2013 PCRA petition, including: actual innocence due to insanity and involuntary intoxication based on Ritalin use; incompetence to plead guilty; and ineffective assistance of counsel for advising him to plead guilty in light of his possible defenses. The petition included a lengthy statement on timeliness, discussing Wallace's long history of mental illness as well as purportedly recently discovered facts concerning Wallace's lack of malice at the time of the offense and the potential side effects of Ritalin. At Wallace's request, the District Court appointed counsel from the Federal Community Defender Office.

In November 2017, Magistrate Judge Marilyn Heffley issued a detailed Report & Recommendation (R&R) addressing Wallace's habeas claims. In the R&R, she observed that, because Wallace did not appeal, his deadline to file a habeas petition was January 7, 2002. *See* 28 U.S.C. § 2244(d). She further concluded that neither statutory nor equitable tolling applied to extend the deadline.

17

As to equitable tolling, Magistrate Judge Heffley concluded that Wallace failed to establish that extraordinary circumstances prevented him from filing a petition throughout the entire period of delay. She noted that Drs. Cooke and Sadoff had opined that Wallace was not legally insane at the time of the crime and that he was competent to stand trial. She concluded that Wallace failed to meet his burden to show that his mental illness prevented him from pursuing his legal rights during the statute of limitations period or for the subsequent 13 years. Notably, Magistrate Judge Heffley found that Wallace's bipolar disorder was in full remission for several years beginning in December 2007. In addition, even if his "marked recovery" leading to the ability to file in court did not begin until March 2013 (as he alleged), he did not file a federal habeas petition for another two and a half years. JA 731 n.4. She went on to conclude that Wallace did not pursue his claim with reasonable diligence; for more than two years, he pursued a PCRA petition rather than federal relief. Accordingly, she recommended that the habeas petition be denied.

In response to the R&R, Wallace's counsel moved to withdraw from further representation. Magistrate Judge Heffley issued a show cause order directing Wallace to demonstrate why the withdrawal request should not be granted. Wallace moved for appointment of standby counsel, leave to file objections, and funds to hire an

expert. Wallace then filed a lengthy set of objections to the R&R accompanied by voluminous exhibits. On August 8, 2018, District Judge Jeffrey Schmehl approved and adopted the R&R, dismissed Wallace's petition, granted counsel's motion to withdraw, and denied the motion for expert funds as moot.

Wallace timely filed a pro se notice of appeal and applied for a certificate of appealability (COA). A panel of this Court appointed counsel and granted a COA on the following issues relevant to the petition's timeliness:

(1) Whether Wallace is entitled to equitable tolling;

(2) Whether the District Court should have addressed Wallace's claim of innocence by reason of insanity or involuntary intoxication as a ground to excuse compliance with the statute of limitations under the equitable exception established by *McQuiggin v. Perkins*, 569 U.S. 383 (2013); and

(3) Whether the District Court should have addressed the merits of the motion for funds for an expert instead of dismissing it as moot.[10]

_____

[10] Additionally, the panel granted the COA on: (1) whether Wallace is innocent of murder by reason of insanity or involuntary intoxication; (2) whether he was incompetent

19

We address the issues in turn.

## III.  STANDARD OF REVIEW

The District Court exercised jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254.  We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

We conduct a plenary review of the District Court's order dismissing a habeas petition as time-barred.[11]

---

to plead guilty; and (3) whether his counsel rendered ineffective assistance by advising him to plead guilty without (a) ensuring his competence and (b) properly investigating insanity and involuntary intoxication defenses.  Our disposition on timeliness makes it unnecessary for us to reach these additional issues.

[11] In a non-precedential opinion, a panel of this Court observed that "it does not appear that we have definitively decided the standard of review applicable to the question of equitable tolling where there is a dispute concerning the petitioner's mental competence."  *Champney v. Sec'y DOC*, 469 F. App'x 113, 115 (3d Cir. 2012).  To the extent *Champney* identified an open question, we conclude that *de novo* review applies.  First, *de novo* review applies generally to a timeliness decision in a habeas case, *see Schlueter v. Varner*, 384 F.3d 69, 73 (3d Cir. 2004), and Wallace offers no reason to apply a different standard here.  Second, because the District Court did not conduct

20

*Schlueter v. Varner*, 384 F.3d 69, 73 (3d Cir. 2004). In the context of an actual innocence claim, we also conduct a plenary review of whether a petitioner's evidence is sufficient to meet the standard set forth in *Schlup v. Delo*, 513 U.S. 298, 329 (1995). *Munchinski v. Wilson*, 694 F.3d 308, 337–38 (3d Cir. 2012).

We review a District Court's decision not to hold an evidentiary hearing for abuse of discretion. *See Morris v. Beard*, 633 F.3d 185, 193 (3d Cir. 2011). We apply that same standard of review to the denial of discovery and the motion for expert witness funds.[12] *See Han Tak Lee v. Glunt*, 667 F.3d 397, 404 (3d Cir. 2012). A District Court abuses its discretion when the requested discovery is

---

a hearing, it was in no better position than we are to review the documentary evidence. Accordingly, a more deferential standard of review is not warranted.

[12] Discovery in a habeas proceeding is permitted under Rule 6 of the Rules Governing § 2254 Cases, which provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." To satisfy the "good cause" standard, a petitioner must set forth specific factual allegations which, if fully developed, would show entitlement to the writ. *See Williams v. Beard*, 637 F.3d 195, 209 (3d Cir. 2011).

essential for the habeas petitioner to develop fully his underlying claim.  *Id*.

## IV.    EQUITABLE TOLLING

A habeas petition under § 2254 must be filed within one year of, *inter alia*, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).[13]

Because Wallace did not appeal, the judgment became final thirty days after his sentence was imposed, on January 5, 2001.  *See* Pa. R. App. P. 903(c)(3).  Thus, under § 2244(d)(1)(A), his petition was due one year later, by January 7, 2002.[14]  But Wallace did not file until September 29, 2015.  Although Wallace did not file his habeas petition within the one-year period, he argues that he is entitled to equitable tolling of the approximately

---

[13] The remaining provisions of § 2244(d) concerning the running of the limitations period, § 2244(d)(1)(B)–(D), do not apply in Wallace's case.

[14] The last day of the one-year period, January 5, 2002, fell on a Saturday, so the petition would have been due the following Monday, January 7, 2002.  *See* Fed. R. Civ. P. 6(a)(1)(C).

22

fourteen-year period from January 7, 2002 through September 29, 2015.

## A. *Legal Standard*

Equitable tolling applies when a petitioner has been prevented in "some extraordinary way" from timely filing and has "exercised reasonable diligence" in bringing the claims. *Nara v. Frank*, 264 F.3d 310, 319 (3d Cir. 2001), *overruled in part on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002). The petitioner bears the burden of establishing both extraordinary circumstances and reasonable diligence. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). There are no bright lines for determining eligibility. *Pabon v. Mahanoy*, 654 F.3d 385, 399 (3d Cir. 2011). Although this equitable doctrine is used sparingly, the assessment is flexible and the particular circumstances of the petitioner must be taken into account. *Id.*

## B. *Extraordinary Circumstances*

In *Nara v. Frank*, we held that suffering from a mental illness does not *per se* entitle a petitioner to equitable tolling. 264 F.3d at 320. Instead, to qualify as an extraordinary circumstance, the mental illness must have affected the petitioner's ability to seek relief in some way. *Id.* We did not specify how a court should make that determination. Instead, we held in Nara's particular case

23

that, if his allegations were true, extraordinary circumstances *may* have been present. So we remanded the matter to the District Court to develop the record without offering an opinion as to the proper outcome. *Id.* In *Pabon v. Mahanoy*, we reiterated that the relevant inquiry for purposes of assessing extraordinary circumstances is "how severe an obstacle [the circumstance] creates with respect to meeting AEDPA's one-year deadline."[15] 654 F.3d at 401.

Wallace suggests that we employ a more rigid framework for assessing his extraordinary circumstances claim. He looks to a non-precedential case by a panel of our Court, *Champney v. Sec'y DOC*, 469 F. App'x 113, 117–18 (3d Cir. 2012), which provided a "non-exhaustive list of factors to consider" in determining whether mental illness constitutes an extraordinary circumstance for equitable tolling purposes. The *Champney* factors include:

---

[15] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, substantially revised the law governing federal habeas corpus. *See In re Minarik*, 166 F.3d 591, 595 (3d Cir. 1999). Among other things, AEDPA set a one-year limitations period for filing a federal habeas petition. *See Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005).

24

(1) whether the petitioner was adjudicated incompetent and, if so, when did the adjudication occur in relation to the habeas statutory period; (2) whether the petitioner was institutionalized for his mental impairment; (3) whether the petitioner handled or assisted in other legal matters which required action during the federal limitations period; and (4) whether the petitioner supported his allegations of impairment with extrinsic evidence such as evaluations and/or medications.

*Id.* at 118 (cleaned up).

Wallace asks us to apply *Champney*'s factors.[16] Although he cannot satisfy the first factor because he has never been adjudicated as incompetent, he easily satisfies factor two, because he has been both voluntarily and involuntarily committed at various times and has required

---

[16] We do not regard our Court's non-precedential opinions as binding authority. *See In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006); 3d Cir. I.O.P. 5.7 (2018). Nonetheless, parties remain free to argue that such opinions set forth persuasive reasoning. *See New Jersey Dep't of Treasury v. Fuld*, 604 F.3d 816, 823 (3d Cir. 2010).

continuous psychiatric care throughout his incarceration. He also satisfies factor three: Wallace did not participate in any legal proceeding during the one-year limitations period; his first post-conviction legal matter was his state court PCRA petition in September 2013. Finally, to satisfy factor four, Wallace has provided substantial medical records to support his claim.

We acknowledge that *Champney*'s non-exhaustive list of factors may be relevant in assessing extraordinary circumstances in mental illness cases, but we decline to adopt *Champney* as establishing any sort of "test" that cabins our analysis. Indeed, in Wallace's case, the *Champney* factors provide little more than a starting point. The three *Champney* factors he satisfies simply lend support to Wallace's claim that he genuinely suffers from a mental illness—but the existence of his mental illness has never been in dispute.

The record amply demonstrates that Wallace has been severely mentally ill for most, or possibly all, of his adult life. Indeed, since his imprisonment, he has not gone unmedicated for any significant length of time. But the fact of his serious illness, without more, is not dispositive of Wallace's tolling claim, *see Nara*, 264 F.3d. at 320, particularly because he asks us to excuse an exceptionally long delay. In fact, were we to conclude that his illness is sufficient—without more—to excuse his belated habeas

filing, then up to this very day, Wallace would not be subject to a deadline. That simply cannot be.

It is apparent from the record that Wallace has had periods of relative stability and good mental health. We can discern that, during those periods, he has been quite capable of pursuing legal remedies; indeed, he has done so in recent years on a pro se basis in both state and federal courts.[17] So it is far from sufficient that Wallace has demonstrated the existence of a serious illness. Instead, we must consider the totality of the circumstances in determining whether the record supports Wallace's claim that he had no periods of sufficiently good mental health from 2000 through 2015, during which time he could have pursued a federal habeas petition.

To do so, we look to the medical records Wallace has provided to discern whether they support his position that it was "impossible" for him to pursue post-conviction

---

[17] Counsel points out that some of Wallace's court papers were drafted by fellow inmates. But the ability to seek assistance and work with others to obtain legal relief is, in our view, worthy of consideration in assessing Wallace's equitable tolling claim. Moreover, it is apparent that Wallace drafted at least some of his submissions on his own.

remedies during that entire time.[18] *See* Wallace Br. 31.  In particular, we focus on what the records show about the changes and fluctuations in Wallace's condition over the decade-plus period for which he seeks tolling.

>     (1) 2000 to 2001: period of poor mental health

Around the time of his guilty plea, the records demonstrate unequivocally that Wallace was seriously ill. A doctor's December 2000 report rated his Global

_____

[18] Wallace argues that it was "*impossible* for [him] to pursue his post-conviction remedies because he was simply too mentally impaired and overmedicated to focus on legal matters for any amount of time."  Wallace Br. 31 (emphasis added).  In doing so, he has set a higher bar than necessary for himself.  As previously observed, to demonstrate extraordinary circumstances, Wallace need only have shown that "the alleged mental incompetence must somehow have affected the petitioner's ability to file a timely habeas petition."  *Nara*, 264 F.3d at 320.  We respond to his impossibility claim only because he set this higher bar for himself.  To be clear, however, a petitioner need not necessarily demonstrate impossibility of pursing legal relief in order to show extraordinary circumstances for purposes of equitable tolling.

Assessment of Functioning (GAF) at a score of 50,[19] indicating serious symptoms and impairment of

[19] "The GAF is a numeric rating used by mental health practitioners to measure the functional impairment of a patient on a 0–100 scale in accordance with the Diagnostic and Statistical Manual of Mental Disorders." *Funk v. CIGNA Group Ins.*, 648 F.3d 182, 186 n.6 (3d Cir. 2011) (citing Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., 2000)). As relevant to Wallace, who generally scored in a range from 50 to 75:

80–71 means "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (*e.g.*, difficulty concentrating after family argument); no more than slight impairment in social or occupational functioning (e.g., temporarily falling behind on projects)."

70–61 means "Some mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social or occupational functioning (*e.g.*, theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

60–51 means "Moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers)."

50–41 means "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any

functioning. The same doctor recommended that Wallace be placed in the prison's Special Needs Unit (SNU). At the time, doctors observed that Wallace suffered from "psychomotor retardation" and "pseudodementia" and looked "haggard" and "overmedicated"; eventually doctors recommended Wallace's placement in the prison's Special Observation Unit (SOU). JA 391–92. While in the SOU, Wallace showed serious symptoms and suicidal ideation, and was examined by doctors almost daily. Wallace eventually was discharged to the general population, but he began suffering paranoia and was promptly readmitted to the SOU. Records reflect that Wallace continued to do poorly through the first half of 2001. He suffered paranoid ideations, psychomotor retardation, and severe depression. Doctors continued to assess his GAF at around 50 and even recommended that he undergo Electroconvulsive Therapy treatment for his depression.

(2) <u>Summer 2001 through 2003: period of improvement</u>

Beginning in summer 2001, records demonstrate that Wallace showed notable signs of improvement. He

---

serious impairment in social or occupational functioning (e.g., no friends)." Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., 2000)

30

was returned to the SNU, which meant he was no longer under near-constant observation as he had been while in the SOU. Wallace's doctor visits were scheduled less frequently, and he was asked to return to the clinic only once per month beginning in July 2001. That continued to be his clinic schedule up to and throughout 2005.

By February 2002, doctors noted that Wallace was in partial remission. In summer 2002, doctors described him as "stable," having "no complaints," and showing "no psychosis." JA 490. By the fall, he even described himself as "doing fine on the medications." JA 491.

### (3) 2003 through 2006: period of relatively good mental health

In May 2003, Wallace reported that he was "doing pretty good" and "doing fine." JA 493. Records suggest that he continued to do well throughout 2003 and 2004. In November 2003, doctors assessed his GAF as rising to 65, and by March 2004, they rated his GAF as 70; he maintained that relatively high GAF through July 2004.

Toward the end of 2004, the records show that Wallace again began something of a decline. His GAF decreased to 65 in December 2004, then 60 in January 2005, and then 55 in April through August 2005. Even so, doctors saw him only about once a month.

31

By 2006, doctors further reduced the frequency of Wallace's clinic visits.  He was ordered to return to the clinic in increments of 60 to 90 days through that year.  And during that time, he reported clearer thinking and stability, with no side effects from medications.  Doctors observed that he was "stable" and "doing very well."  JA 519.  Throughout 2006 and 2007, Wallace continued to see his doctors at 90-day intervals and he consistently reported that he felt fine.

(4) 2007 through 2009: period of remission

As Magistrate Judge Heffley noted in her R&R, Wallace submitted a memorandum indicating that his bipolar disorder was stable and in "full remission" for a period of "several years" beginning in late 2007 through 2009.  JA 728 (citing Pet'r Counseled Mem. in Supp. of Equitable Tolling at 9). The records support Wallace's description.  In late 2007 and throughout 2008, Wallace's doctors noted that he was "clinically stable" and that his bipolar disorder was in "full remission." JA 523, 525, 527, 529.  The records from that period indicate that Wallace was stable, calm, had normal thought processes, and did not suffer from delusions.  Wallace's records during this timeframe repeatedly note his good personal grooming, logical thinking, and intact memory.

(5) 2010 to 2011: continuing period of stability

32

In 2010 and 2011, the records continue to indicate that Wallace experienced comparative stability and needed only infrequent doctors' visits (generally at 30-day intervals). Wallace's GAF was assessed as high as 75 during this period.

(6) 2011 to 2013: period of serious deterioration

The records show that Wallace's period of relative stability and well-being came to an end by the summer of 2011. In July 2011, Wallace voiced a concern about hurting others. By September of that year, the records reflect that he was suffering from "bipolar depression." JA 540. His religious preoccupation and delusions reemerged. He began to complain of side-effects from his medications, and eventually stopped taking some of them. He was admitted for psychiatric observation on several occasions based on concerns that he could be suicidal or might hurt others.

Doctors once again began to observe psychomotor retardation and slow thought-processes. He showed impaired judgment, illogical thinking, poor insight, and increasing paranoia. Despite those challenges with his illness, he told a doctor in November 2012 that his goals included "contact attorney for help on case." JA 406.

By the end of 2012, Wallace was involuntarily committed for mental health treatment because his worsening delusions caused him to become a danger to others.

(7) <u>2013 to 2015: period of relatively poor mental health, but successful pursuit of state legal relief</u>

In 2013 through 2015, Wallace continued to experience serious mental health issues. Wallace's GAF deteriorated to the 50s, he had frequent doctor visits, and demonstrated impaired and limited judgment and insight. He also experienced periods in which delusions and paranoia returned along with suicidal ideations, and he sometimes required constant observation.

Yet some entries in the medical records reflect that, in 2013–2015, Wallace experienced somewhat better mental health than he had demonstrated during the 2011–2013 timeframe. Nonetheless, Wallace's mental health did not fully rebound to the period of relative wellness that he had shown in the 2002–2006 and 2007–2010 time periods.

Even so, Wallace was well enough to pursue state PCRA relief. By September 3, 2013, he had filed his PCRA petition, albeit with assistance. And, notably, by December 2013 Wallace filed a brief—expressly

informing the PCRA court that he did so without assistance. *See* JA 1372 (Third PCRA Supplement, dated Dec. 19, 2013) ("Unlike my previous supplements and PCRA, this supplement is submitted without assistance, pro se.").

\* \* \*

The foregoing summary reflects the highlights of our minute review of the hundreds of pages of medical records that Wallace has provided. Our examination confirms that there were substantial periods—several years worth, in fact—during which Wallace appears to have experienced relatively good mental health, with periods in which he was in "full remission" and stable. We stress our agreement with Magistrate Judge Heffley's finding that the documentary record indicates that Wallace was stable and in remission during the 2007 to 2009 time period, JA 728, 730–31, and therefore was not prevented by his illness from pursuing a habeas petition in those years.[20] In fact, there likely was a considerably longer

---

[20] Because we have identified a period of longer than one year in which Wallace has failed to demonstrate the existence of extraordinary circumstances, we need not engage in the intricate counting that is required to compute any hypothetical tolling period. *See Schlueter v. Varner*, 384 F.3d 69, 77 n.12 (3d Cir. 2004).

35

period—from as early as 2003 and ending as late as 2011—during which Wallace's mental condition was sufficiently stable to have allowed him to pursue his legal rights.

The burden remains on Wallace to establish that extraordinary circumstances prevented him from filing a habeas petition for the entirety of the period for which he has sought tolling. The records provide insufficient support for his claim.

Wallace responds by arguing that, despite his remission during the 2007–2009 timeframe, the record still shows that he was heavily medicated. According to Wallace, his condition was "controlled not cured," and the medications "dulled" his ability to think clearly about his legal case. Wallace Br. at 34–35.

Wallace fails to cite record support for his claim that his medications caused him to suffer a "significant cost to his cognitive function." *See id.* at 17. Nonetheless, accepting that Wallace's medications interfered to some extent with his ability to think clearly, we are not satisfied that the records demonstrate that his medications prevented him from pursuing legal relief before 2013. *See id.* at 30–31. Moreover, and strikingly, Wallace was able in 2013 to pursue state post-conviction relief—despite his many medications and his claimed decline in mental health. Our careful comparison of the medical records

36

from 2013–2015 to those from earlier time periods, including the 2007–2009 timeframe, compel us to reiterate: Wallace did not experience extraordinary circumstances preventing him from pursuing legal relief when his mental health was comparatively better, even though he was taking medications at the time. *See* Wallace Br. 30–31.

Wallace also argues that remand—and authorization of funds to hire an expert—is necessary before we may dispose of his claim. We disagree. There is substantial documentary evidence in the record before us, and it supports our conclusion that Wallace's mental illness did not pose a sufficiently severe obstacle to his pursuit of legal remedies for a period of several years. We conclude that Wallace has failed to produce evidence sufficient to warrant a hearing on that issue. *Compare Pabon*, 654 F.3d at 401–02 (because there was substantial evidence of the requisite extraordinary circumstances, remand was ordered for an evidentiary hearing on the issue); *Nara*, 264 F.3d at 320 (although there was no evidence of record, because Nara's petition was *pro se* and because he "presented evidence of ongoing, if not consecutive[,] periods of mental incompetency," remand was ordered for an evidentiary hearing).

37

C. *Reasonable Diligence*

In addition to his claim of extraordinary circumstances, Wallace argues that he showed reasonable diligence in pursuing legal relief, the second prong he must satisfy in order to avail himself of the equitable tolling doctrine. For the period from 2002 until 2013, his diligence claim essentially overlaps with his extraordinary circumstances claim: Wallace contends that legal filings of any kind were "impossible" for him due to his mental illness. *See* Wallace Br. 30–31. We are skeptical of this claim because, as we have already observed, the medical records do not support Wallace's position.

Yet even if we were to accept that Wallace showed reasonable diligence under the circumstances prior to 2013, it was certainly possible for him to file by early 2013. It was then that he was mentally well enough to have pursued PCRA relief.[21] Yet he did not file a federal

---

[21] According to his 2017 affidavit, Wallace first began discussing his legal case with a doctor in "fall of 2012," and by "early 2013" he began working on a draft PCRA petition. JA 356. He ultimately filed the PCRA petition in September 2013. Thus, nearly a year passed from the time Wallace began thinking about filing a PCRA petition until he actually filed one. This delay further undermines his claim of diligence.

habeas petition in 2013, waiting instead until September 2015. Wallace argues that he is entitled to equitable tolling of this approximately two-year period because he was pursuing PCRA relief, and his choice reflects reasonable diligence.[22] We disagree.

Had the PCRA Court concluded that Wallace's 2013 PCRA petition was timely filed under a statutory exception to Pennsylvania's one-year limitations period, then that state petition would have been "properly filed."[23]

---

[22] In his brief, Wallace argues that he was quite ill during the 2013–2015 timeframe; he "see-sawed between the psychiatric observation unit and the general population." Wallace Br. 37. As discussed *supra*, the medical records support this claim. Yet Wallace still pursued his PCRA petition during that same time, successfully engaging assistance when he needed it. We reiterate our view that Wallace's ability to pursue legal relief while experiencing what may well have been serious symptoms undermines his position that it was "impossible" to have filed legal documents sooner due to his mental illness. *See* Wallace Br. 31.

[23] Pennsylvania treats its statute of limitations as jurisdictional and therefore does not permit equitable tolling. There are three statutory exceptions that may extend the one-year PCRA limitations period. Wallace

39

*See Merritt v. Blaine*, 326 F.3d 157, 161 (3d Cir. 2003); 28 U.S.C. § 2244(d)(2). But the PCRA Court did *not* accept Wallace's argument that a statutory exception applied, and it dismissed his PCRA petition as untimely. We afford deference to that determination. *See Merritt*, 326 F.3d at 168. Accordingly, Wallace's PCRA petition was not "properly filed" for statutory tolling purposes.

Wallace nonetheless argues that his decision to pursue a PCRA petition reflects diligence in pursuing legal relief, and that we should not hold the approximately two-year period during which he pursued PCRA relief against him. Yet he could have filed a protective federal habeas petition during the pendency of his PCRA proceeding, as described by the Supreme Court in *Pace v. DiGuglielmo*, 544 U.S. 408, 416–17 (2005). His failure to do so undermines his diligence claim.

In *Pace*, the Supreme Court addressed a claim for both statutory and equitable tolling by a habeas petitioner who, like Wallace, had first pursued state collateral relief that was ultimately rejected as untimely. The Supreme Court discussed the possible unfairness that arises when such an individual, in good faith, attempts to exhaust state remedies—a process that may take years—only to

attempted to invoke the exception for newly discovered facts. *See* 42 Pa. C.S. § 9545(b)(1)(ii).

ultimately learn that the state courts have rejected the claim as untimely and therefore never "properly filed": "A prisoner seeking state postconviction relief might avoid this predicament . . . by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." *Id.* at 416.

Although the discussion in *Pace* pertained to statutory tolling, it suggests that Wallace's pursuit of a PCRA petition—without making some effort to preserve his federal rights—weighs against a conclusion that he was reasonably diligent for equitable tolling purposes. *See Palacios v. Stephens*, 723 F.3d 600, 608 (5th Cir. 2013). Moreover, Wallace had notice by September 24, 2014 that the Court of Common Pleas had rejected his timeliness arguments. He surely was aware by that time that his efforts in state court were unlikely to be successful and that federal relief could be necessary. *See White v. Martel*, 601 F.3d 882, 884–85 (9th Cir. 2010). Yet Wallace waited another full year—until September 29, 2015—to file his federal habeas petition. We simply cannot conclude that such delay reflects reasonable diligence in pursuing a federal habeas claim.

Finally, Wallace contends that he relied on the mistaken advice of a fellow inmate in reaching the incorrect conclusion that filing a PCRA proceeding would

"reset" the deadlines for his federal habeas petition. Wallace Br. 40. But erroneous legal advice is not a basis for invoking equitable tolling. *Schlueter v. Varner*, 384 F.3d 69, 76 (3d Cir. 2004) (observing that, in non-capital cases, attorney error generally is not a basis for equitable tolling); *Jones v. Morton*, 195 F.3d 153, 160 (3d Cir. 1999) (holding that misunderstanding the exhaustion requirement does not excuse a failure to comply with the statute of limitations requirement).

\* \* \*

In sum, even were we to conclude that extraordinary circumstances prevented Wallace from filing his habeas petition before 2013, he was insufficiently diligent in preserving his federal rights between 2013 and 2015 so that he might avail himself of equitable tolling. Wallace's lack of reasonable diligence provides an independent ground for rejection of his equitable tolling claim. We also view the fact that no expert testimony would reasonably assist Wallace in overcoming his lack of diligence in pursuing habeas relief between 2013 and 2015 as reinforcing our determination that an evidentiary hearing on his equitable tolling claim is unnecessary.

## V.    ACTUAL INNOCENCE

As an alternative to equitable tolling, Wallace argues that he should be excused from the statute of

42

limitations because he is actually innocent of murder. Specifically, at the time of the crime, Wallace claims he was intoxicated by Ritalin and that it rendered him temporarily insane such that he was incapable of forming the requisite intent to commit murder.

In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court discussed the "actual innocence gateway" first recognized in *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995), which is an equitable exception to certain procedural requirements permitted only in those rare habeas cases implicating a fundamental miscarriage of justice. In *McQuiggin*, the petitioner filed a federal habeas petition more than a decade after his first-degree murder conviction became final. To overcome the statute of limitations problem he faced, he provided newly discovered evidence of his actual innocence—specifically, the affidavits of three witnesses attesting that the true perpetrator had either confessed to them or shown them his blood-stained clothing. The Supreme Court granted *certiorari* to resolve a Circuit split concerning whether there is an exception to AEDPA's one-year statute of limitations for a claim of actual innocence.

The Supreme Court concluded that such an exception exists. Justice Ginsburg, writing for a five-justice majority, stated: "We hold that actual innocence, if proved, serves as a gateway through which a petitioner

43

may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare." *McQuiggin*, 569 U.S. at 386. To pass through that gateway, the petitioner must persuade the District Court that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* Although delay in filing is not a bar to relief, it nonetheless remains "a factor in determining whether actual innocence has been reliably shown." *Id.* at 387.

* * *

Thus, *McQuiggin* establishes an *exception* to the statute of limitations, even where a petitioner may not qualify for an *extension* to the statute of limitations via equitable tolling.[24] *See McQuiggin*, 569 U.S. at 400. To satisfy the demanding actual innocence exception, a

---

[24] Ultimately, the Supreme Court observed that Perkins himself probably was not entitled to the exception recognized in his case because the District Court had determined that the information in the affidavits he provided was "substantially available" at trial and, even if "new," "was hardly adequate to show that . . . no reasonable juror would have convicted Perkins." *Id.* at 400–01.

44

petitioner must (1) present new, reliable evidence of his innocence; and (2) show by a preponderance of the evidence that it is more likely than not that no reasonable juror would have convicted him (*i.e.*, a reasonable juror would have reasonable doubt about his guilt) in light of the new evidence. *Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018).

We review *de novo* whether a petitioner's evidence is sufficient to pass through the actual innocence gateway. *Munchinski*, 694 F.3d at 337. We do not make an independent factual determination of what actually happened. Rather, we assess the likely impact that the new evidence would have had on reasonable jurors. *Reeves*, 897 F.3d at 161. The standard does not require absolute certainty of guilt or innocence, but it is demanding and will be satisfied only in rare and extraordinary cases where the evidence of innocence is so strong that it undermines confidence in the trial's outcome. *Id.*

For reasons we cannot discern, the District Court never addressed Wallace's actual innocence claim. Wallace contends that, by limiting his appointment of counsel to the issue of his mental state from 2001 through 2013, the Magistrate Judge effectively prevented him from arguing actual innocence and summarily denied the claim by failing to address it on the merits. And then, when Wallace reiterated his actual innocence claim in his

45

objections to the Magistrate Judge's R&R, the District Court neglected to address that claim as well. Accordingly, "[t]here is not even a finding on which to permit meaningful appellate review."  Wallace Br. 57. Wallace argues that the failure of the District Court to address the issue warrants reversal and remand.

We agree that it was error for the District Court to have failed to address his actual innocence claim.  We need not direct a remand, however.  In exercising *de novo* review, it is apparent to us that Wallace cannot meet the stringent actual innocence standard.  He has put forth no new, reliable evidence of actual innocence, nor has he established that, in light of the evidence, no reasonable juror would have convicted him.

A. *New, Reliable Evidence of Actual Innocence*[25]

Wallace contends that counsel failed to adequately investigate the role that Ritalin played in causing his

---

[25] Because Wallace committed the physical act of killing his wife, his actual innocence claim turns on whether he has a defense to murder based on a lack of mental capacity. Some of our sister Courts of Appeals have concluded that "actual innocence" claims can encompass complete defenses such as insanity.  For instance, in *Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999), the Seventh Circuit determined that an individual may commit a killing yet

psychosis.  He claims that counsel's failure to explore a link between psychosis and Ritalin undermines confidence in the outcome of Wallace's criminal proceeding.

---

still claim actual innocence of murder by invocation of an insanity defense.  But other Courts of Appeals consider this an open question. *See Rozzelle v. Secretary Fla. Dep't Corr.*, 672 F.3d 1000, 1015 (11th Cir. 2012) ("Today, we need not decide whether *Schlup* permits a claim of actual innocence based on 'new reliable' evidence of a complete affirmative defense that renders the conduct of conviction wholly noncriminal and requires acquittal.").  Previously, we have assumed without deciding that both mental illness and involuntary intoxication defenses *may* qualify for the actual innocence gateway.  *See In re Minarik*, 166 F.3d 591, 607–08 (3d Cir. 1999); *Glass v. Vaughn*, 65 F.3d 13, 16–17 (3d Cir. 1995).  But we have never reached the question of whether such defenses can, as a matter of law, satisfy the actual innocence standard because, in all cases to date, the defendants failed to demonstrate actual innocence on the facts.  Similarly, Wallace does not present a factual case that meets the rigorous actual innocence standard.  So once again, we need not decide definitively whether, as a matter of law, a defense of insanity or involuntary intoxication may qualify for the actual innocence gateway.

47

For actual innocence purposes, "new" evidence includes both newly discovered evidence as well as exculpatory evidence that counsel failed to discover or present at trial. *Reeves v. Fayette SCI*, 897 F.3d 154, 163–64 (3d Cir. 2018) ("[W]hen a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the *Schlup* actual innocence gateway."). In addition, although there is no diligence requirement, we have held that a court may consider how the timing of the habeas petition bears on the probable reliability of the "new" evidence. *Id.* at 161.

We have serious doubts that Wallace's Ritalin evidence constitutes "new, reliable evidence of actual innocence" for at least four reasons: (1) the evidence is not "new" because, during preparations for trial, defense counsel provided the doctors who examined Wallace with medical records showing that Wallace was prescribed Ritalin; (2) the evidence is not "reliable" because Wallace's strongest evidence is, at most, a tentative opinion rendered after more than a decade of delay; (3) the evidence does not show actual innocence because Pennsylvania law does not recognize involuntary intoxication as a defense to murder; and (4) the evidence

48

does not show actual innocence because Pennsylvania courts view the etiology of insanity as irrelevant.

(1) Wallace's evidence is not new because defense counsel provided the doctors who examined him with medical records showing that Wallace was prescribed Ritalin.

Wallace's purportedly "new" evidence turns on his discovery that taking Ritalin may have either caused or exacerbated his psychosis.[26] He argues that "[h]is experts were never able to evaluate what role Ritalin played on the deeply psychotic condition which led to [the crime]."

---

[26] Wallace does not contend that the science underlying his Ritalin claim—that is, that Ritalin may contribute to psychosis—is "new." The possibility that Ritalin may exacerbate psychosis has long been public knowledge. For instance, the record contains a 1997 version of the Ritalin label, which warned against Ritalin use with psychotic children because it may "exacerbate symptoms." JA 341. Indeed, Wallace's claim that counsel was ineffective for failing to adequately investigate the link between Ritalin and Wallace's psychosis relies on only an assumption that the science was established at the time of Wallace's crime.

Wallace Br. 49.  Although Wallace argues otherwise, the record shows that defense experts reviewed records reflecting that Wallace had been prescribed Ritalin before he committed the crime.

Wallace's medical records, in particular those from psychiatrist Dori Middleman, showed that Wallace was taking Ritalin for ADHD in the years prior to the murder, beginning as early as 1997.  In Dr. Sadoff's June 2000 report, he noted that Dr. Middleman had prescribed both Paxil and Ritalin for Wallace.  Although Dr. Cooke did not directly mention Ritalin, he stated in his June 2000 report that he had reviewed Dr. Middleman's records, including Wallace's medications for ADHD.

The contention, then, that Wallace's experts were unable to evaluate the potential role of Ritalin is not supported by the record.  Even if Drs. Cooke and Sadoff may have failed to appreciate Ritalin's significance at the time they examined Wallace, it cannot be said that the information was unavailable to them.

(2) Wallace's Ritalin evidence is not reliable because it is based on a tentative opinion.

Let us suppose that Ritalin's potential contributing role in Wallace's psychosis is "new" because the defense experts did not recognize its import at the time of trial preparations.  We still have serious doubt that any role that

50

Ritalin possibly played in Wallace's violent behavior constitutes "reliable" evidence of actual innocence. Even up to today, after pursuing this collateral attack for years, Wallace presents little more than one doctor's tentative hypothesis that Ritalin might have exacerbated his psychosis.

In August 2014, Dr. Cooke reported that although Ritalin "did not cause the psychotic episode" leading up to the stabbing death, it "exacerbated [Wallace's] psychosis and contributed to the disinhibition that led to the offense." JA 801. Dr. Cooke stated that he did not provide this opinion sooner because he did not know that Wallace had been taking Ambien, Ritalin, and Paxil around the time of the killing.[27] His 2014 opinion suggests that some, as-yet-unidentified medical practitioner could opine that "the involuntary intoxication from the medication exacerbated [Wallace's] psychosis"—*although Dr. Cooke himself did not attest to that*. JA 801. Instead, he suggests that Wallace "would need an M.D. to give expert testimony regarding the effects of the medication." *Id*.

---

[27] As noted previously, however, Dr. Cooke stated in June 2000 that he had reviewed Wallace's medical records, which included the records from Dr. Middleman showing Wallace's Ritalin prescription for ADHD.

51

Furthermore, Dr. Cooke went on to opine that his new assessment concerning Ritalin's contributing role did not change his view—originally expressed in his June 2000 report—that Wallace knew that what he was doing was wrong under "man's law." *Id.* Dr. Cooke concluded that his "opinion regarding competency and insanity is not affected by [his] recently acquired knowledge of the medications [Wallace] was on at the time of the offense." *Id*. Clearly then, Dr. Cooke's 2014 assessment provides only a tentative opinion on the possible existence of a partial defense, and—even taking Ritalin consumption into account—it reiterates his continued view that Wallace was not legally insane at the time he killed his wife.

Moreover, as observed in *Reeves*, we may take into account how the timing of the claim bears on the reliability of the evidence. *Reeves*, 897 F.3d at 161. Here, any information about the possible effects of medications that Wallace was taking at the time of his wife's tragic death is now more than twenty years old. Even back in 2000, Wallace himself did not recall precisely which medications he took before the killing. And with the passage of so many years, Dr. Cooke seems to have forgotten that his earlier review of the records would have revealed to him that Wallace was prescribed Ritalin. It strains credulity to imagine that, at this late date, it would be possible to gain any further, reliable insight into how much Ritalin Wallace may have taken, or the degree to

52

which it might have affected his state of mind at the time of his wife's killing. So for that reason as well, Dr. Cooke's tentative 2014 opinion that Ritalin may have contributed to Wallace's psychosis falls short of providing reliable evidence of actual innocence.

> (3) Wallace's evidence does not show actual innocence because Pennsylvania has not recognized involuntary intoxication as a defense to murder.

At least in part, Wallace's claim of actual innocence relies on an involuntary intoxication defense.[28] Yet whether an involuntary intoxication defense exists under Pennsylvania law is highly doubtful.[29] No Pennsylvania

---

[28] Although Wallace ingested Ritalin voluntarily, he argues that he was involuntarily intoxicated because he was taking the medication pursuant to a doctor's prescription. Jurisdictions recognizing an involuntary intoxication defense apply it in the case of an unexpected intoxication arising from a medically prescribed drug. *Commonwealth v. Smith*, 831 A.2d 636, 639 (Pa. Super. Ct. 2003).

[29] In contrast to involuntary intoxication, Pennsylvania law expressly provides that *voluntary* intoxication may provide a defense to reduce the degree of murder, although voluntary intoxication is not otherwise available as a

statute or Supreme Court case establishes involuntary intoxication as a defense to murder, and the handful of Superior Court cases that discuss the concept demonstrate that, while there remains a *possibility* of such a defense, no defendant to date has successfully invoked it.

For instance, in *Commonwealth v. Smith*, 831 A.3d 636 (Pa. Super. Ct. 2003), the defendant ingested alcohol while wearing a prescription pain patch; she then drove her car and was arrested for driving under the influence (DUI). She claimed that the effects of the medication and alcohol together unexpectedly rendered her involuntarily intoxicated. In appealing her DUI conviction, she asked

---

defense to a criminal charge. 18 Pa. C.S. § 308. A defendant cannot, however, be insulated from criminal liability by claiming insanity due to voluntarily ingesting drugs or alcohol—regardless of whether the person was unaware of the effect that the drugs or alcohol might have. *Commonwealth v. Henry*, 524 Pa. 135, 149 (Pa. 1990) (prohibiting insanity and GBMI defenses when defendant voluntarily ingested alcohol, even if he was unaware of the adverse effects the alcohol would have on him). Furthermore, voluntary intoxication cannot negate the element of malice for purposes of reducing third-degree murder to manslaughter. *Commonwealth v. Hicks*, 483 Pa. 305, 312 (Pa. 1979).

the Superior Court to consider whether Pennsylvania law recognizes involuntary intoxication as a defense.

The Superior Court observed that, in contrast to voluntary intoxication, which is recognized by statute, Pennsylvania law "does not specify whether an involuntary intoxication defense is available." *Id.* at 639; *see also Commonwealth v. DuPont*, 860 A.2d 525, 536 (Pa. Super. 2004) (rejecting PCRA petitioner's claim of ineffective assistance of counsel based on a failure to raise a prescription drug involuntary intoxication defense because no appellate decision has affirmatively acknowledged the existence of such a defense under Pennsylvania law); *Commonwealth v. Plank*, 478 A.2d 872, 875 (Pa. Super. Ct. 1984) (stating that "[i]nvoluntary intoxication may, in certain circumstances, provide a defense to the criminal charge," but an alcoholic blackout cannot qualify).

The *Smith* court observed that other jurisdictions have permitted involuntary intoxication as a complete defense to criminal responsibility "premised upon the notion that [the defendant] was temporarily rendered legally insane at the time he or she committed the offense." 831 A.3d at 639. Those jurisdictions have recognized involuntary intoxication in situations, for instance, "where unexpected intoxication results from a medically prescribed drug" or "where a defendant unknowingly

55

suffers from a physiological or psychological condition that renders him abnormally susceptible to a legal intoxicant." *Id.* Where it is available, a key component of the defense is that the defendant is not culpable in causing the intoxication. *Id.* In Smith's case, she had knowingly introduced alcohol into her system, and its intoxicating tendencies should have been known to her. Thus, assuming (but not deciding) that an involuntary intoxication defense is viable, the court held that "Pennsylvania . . . would not characterize intoxication produced by the voluntary consumption of a prescription drug and alcohol as 'involuntary' even if that consumption was without knowledge of a synergistic effect."[30] *Id.* at 640.

The Superior Court's discussion in *Smith* suggests that a defendant who, like Wallace, has taken prescription drugs that rendered him mentally incompetent *may* have a

---

[30] A decade later, in the unreported case of *Commonwealth v. McDonald*, No. 880 EDA 2012, 2013 WL 11261654 (Pa. Super. Ct. 2013), an arsonist raised an involuntary intoxication defense based on the use of prescription medications. The Superior Court observed that "neither courts nor our legislature has recognized the doctrine of involuntary intoxication," at least outside the context of a DUI. *Id.* at *11 n.31.

complete or partial defense—but only if he can show that the prescription drug rendered him legally insane. Thus, involuntary intoxication would, at most, have provided Wallace another avenue for arguing insanity.

(4) Wallace's evidence does not show actual innocence because Pennsylvania considers the etiology of insanity irrelevant.

Finally, the late-discovered possibility of a causal role for Ritalin in Wallace's mental condition at the time of his wife's fatal stabbing fails to support his actual innocence. Under Pennsylvania law, the cause of insanity is irrelevant to the defense. *Plank*, 478 A.2d at 875. Indeed, that legal proposition is consistent with the PCRA Courts' rejection of Wallace's "new evidence" claim: "The 'new facts' asserted by defendant, including his claim of involuntary intoxication by prescription medication, were not new, rather they were different iterations of an old issue, defendant's mental health at the time he killed his wife." JA 71 (PCRA opinion); *see also* JA 79 (Superior Court denial of PCRA appeal, stating "these are not 'newly discovered facts,' but merely 'a newly willing source for previously known facts'").

At the time of the events in question, Wallace had a potential insanity defense based on his psychosis. Four doctors examined him for that very reason, and all four

57

offered opinions that he was sane at the time of the crime. The later-discovered possible *cause* of Wallace's psychosis—*i.e.*, Wallace's consumption of Ritalin—is not "new evidence" of his innocence. Under Pennsylvania law, even if Wallace had been insane at the time of the crime, the cause of the insanity would not be significant to his invocation of the insanity defense. Evidence concerning the etiology of Wallace's alleged insanity adds nothing.

B. *More Likely Than Not No Reasonable Juror Would Convict*

Apart from whether Wallace has provided "new, reliable evidence" of actual innocence concerning Ritalin's causal or contributing role in his psychosis, we also conclude that the evidence is not so strong that, in light of the record as a whole, no reasonable juror could vote to convict him. Rather, Wallace's evidence simply provides an additional exculpatory fact that a jury could have considered (if the matter had gone to trial) in reaching a decision about whether Wallace had the *mens rea* to commit murder.

In Pennsylvania, the *mens rea* for murder is that the killing is committed with "malice aforethought."[31] *See Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017). Pennsylvania's Supreme Court has long defined malice as follows:

> [I]t is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge. Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Id.* (citing *Commonwealth v. Drum*, 58 Pa. 9 (Pa. 1868)).

Wallace argues that he is actually innocent because he was legally insane and thus unable to form malice to commit murder. Under Pennsylvania law, legal insanity "means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality

---

[31] "Malice" differentiates murder from all other types of homicide, such as manslaughter. *See Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017).

59

of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong." 18 Pa. C.S. § 315(b). Wallace argues that "[n]o juror presented with this evidence [of his taking Ritalin and its potential effect on his psychosis]—in addition to psycho-pharmacologist expert testimony for which Mr. Wallace has repeatedly begged—would have found he had the requisite *mens rea* to intentionally kill his wife." Wallace Br. 52. We disagree.

It is possible that Wallace's "new" evidence concerning Ritalin's potential role could have been useful to his defense counsel had he proceeded to trial. But, in light of the record as a whole, the evidence is hardly so strong as to show by a preponderance of the evidence that it would have been more likely for a reasonable juror to have refused to convict him of murder. That is because there was also substantial record evidence supporting a conclusion that Wallace *did* have the requisite *mens rea* to commit that crime.

We are mindful that Wallace's expert, Dr. Cooke, opined in June 2000 that, although Wallace did not act with "malice" in the colloquial sense, he was not legally insane at the time of the murder:

> Wallace was overtly and grossly psychotic at the time of the offense, and . . . his actions followed from a psychotic delusion. If not

60

for his psychosis, it is my opinion that this offense would not have occurred. It is also my opinion that because of his psychosis he could not conform his behavior to the requirements of law and therefore he would meet the criteria for Guilty but Mentally Ill. However, though he believed that he was acting based on a higher law, **he did know that by Man's law what he did would be viewed as wrong, and that the police would come looking for him. Therefore, it is my opinion that he does not meet the stricter M'Naughten standard for Insanity**. . . . [I]t is my opinion that Mr. Wallace acted without malice. Rather, based on his delusions, he felt he was freeing his wife from an evil world and sending her to heaven.

JA 277 (emphasis added).

Similarly, Dr. Sadoff opined in his June 2000 report that Wallace stabbed his wife "with a benevolent intent and without malice, *i.e.*, without the intent to harm her, but rather to help her get out of the misery of this world." JA 259. But Dr. Sadoff went on to opine that Wallace acted with intent:

Mr. Wallace knew that he was stabbing his wife and knew that it was against the law.

61

> His behavior indicates that he wanted to avoid the police and knew that taking another's life was against the law. . . . **Mr. Wallace had the ability to form the intent to kill his wife, which is what he intended to do, and carried out his intention**.

JA 259 (emphasis added).

Wallace argues that both defense doctors' reports refer to a "lack of malice," so Wallace did not satisfy the legal element of "malice" for purposes of murder. We remain unpersuaded. It is readily apparent that the two doctors were using the colloquial sense of "malice" to indicate ill will or spite, not the legal term of art under Pennsylvania law.

For instance, in a follow-up report dated November 27, 2000, in which defense counsel specifically asked Dr. Cooke to opine on whether Wallace acted with malice, he stated that "because [Wallace] acted out these delusions believing that what he was doing was out of love and right in the eyes of God, he acted without malice." JA 312. While acting "out of love" may indicate that Wallace was not hateful or angry, this does not mean that, as a matter of Pennsylvania law, he did not act without regard to social duty or in disregard of the consequences of his actions. Similarly, Dr. Sadoff opined that Wallace was not acting with malice, but defined malice as being "without the

62

intent to harm [his wife], but rather to help her get out of the misery of this world." JA 259. Again, the view that Wallace acted with a benevolent intent is not at odds with a conclusion that he acted with malice as it is defined under Pennsylvania law.

In contrast with the two defense doctors, the Commonwealth's expert, Dr. Timothy Michals, did cite the correct legal definition of malice. And Dr. Michals concluded unequivocally that Wallace's actions satisfied that definition:

> It is my understanding that malice is defined as, "Thus, killing is with malice if the killer acts with: first, an intention to kill, or second, an intent to inflict serious bodily harm, or third, (a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life) (a conscious disregard of an unjustified and extremely high risk that his actions might cause death or serious bodily harm).["]
>
> **It is my opinion that Mr. Wallace's killing of his wife was done with malice. Secondly,**

63

**it is my opinion that he intended to inflict serious bodily harm. Thirdly, it is my opinion, based on the review of the autopsy and the photographs of Mrs. Wallace, that Mr. Wallace acted with wickedness of disposition, hardness of the heart, cruelty and recklessness in taking his wife's life** and this was not a benevolent killing.

JA 1448 (emphasis added).

Thus, the doctors' reports provide strong evidence that Wallace was not "actually innocent" on the basis of insanity. Wallace's counsel, attorney Andes, recognized as much. During a September 26, 2000 hearing, he argued: "[B]ased on the psychological/psychiatric reports that I have received from my experts, **there is almost no chance of a finding of not guilty by reason of insanity** . . . [and] we will be looking at a case where the jury will have to decide if he was guilty but mentally ill." JA 1057 (emphasis added).

In addition to the doctors' reports, the record demonstrates that Wallace, after killing his wife, acted in a manner that could support a reasonable juror's conclusion that he understood what he was doing, that it was wrong, and that it would subject him to arrest. Indeed, many of his actions could be viewed as conscious efforts to evade detection.

64

For instance, Wallace told police that, after the killing, he put the knife in a drawer, showered, got dressed, and went to a Wawa convenience store. He apparently locked the door to the house when he left, because all doors to the house were found to be locked when the police arrived. Wallace told police that he left the Wawa for the Downingtown train station from which he took a train to Philadelphia. Although he claimed that he intended to commit suicide, he also explained that he left Downingtown for Philadelphia because he "thought the police would be looking for me there." JA 969.

Similarly, Wallace told Dr. Sadoff in June 2000 that, after the stabbing, he "showered, changed clothes and got out. He said he got out in a hurry in case she [Eileen] got hold of the police. . . . He did know the police would be looking for him. . . ." JA 257. The arresting officers also testified that Wallace had changed his clothes, and that, when they discovered him in Thirtieth Street Station in Philadelphia, he appeared to be "trying to blend in." JA 1107.

In addition, on the day after the killing, Wallace had a steady and seemingly rational demeanor. He appeared to the officers who interviewed him as calm, courteous, conversational, and not upset. During a suppression hearing, one detective testified to how calm and normal Wallace's demeanor appeared at the time of his arrest:

65

Sir, his tone and inflection as he was – in narrative form going through the events that – of the evening, to me was a normal conversation form. The way he was conversing was a normal conversation everybody would have. There was tone, there was inflection. I don't remember emotional appearance on his face or anything like that, but **it was clear to me that he was fully aware of the statement he was making and he was telling us as best he could in detail of what happened**.

JA 1144 (emphasis added).

We recognize that the record evidence concerning Wallace's behavior and demeanor after committing the crime is not dispositive of his mental health or ability to form a *mens rea* for murder. Yet having such evidence before the finders of fact could support a reasonable juror's conclusion that Wallace was in control of his actions and emotions and not so psychotic that he could not understand how to behave or make rational decisions.

Indeed, as the trial date approached, Wallace's counsel decided to advocate that the insanity issue be presented to the jury as a fact issue: "We have taken the position that even though our doctors do not indicate that [Wallace] was M'Naughton insane, that this should be

66

presented to a jury.  You'll have to decide that."  JA 1232.
In response, the prosecution made clear that, depending on
how mental health was to be presented by the defense, it
"may be forced to put on a big rebuttal case."  JA 1237.
These comments demonstrate that the issue of Wallace's
sanity and ability to form the requisite *mens rea* would
have been hotly contested at trial.

In sum, in light of the "new" evidence, a reasonable
juror might have concluded that Wallace was too mentally
ill to form the *mens rea* to commit murder.  On the other
hand, a reasonable juror might well have concluded that
the doctors' reports, coupled with evidence concerning
Wallace's actions and demeanor around the time of the
crime, indicated that he did possess the requisite intent to
commit murder.  When there exists sufficiently strong
competing evidence undermining an innocence claim, a
defendant is not entitled to pass through the "actual
innocence" gateway.

Our decision in *Glass v. Vaughn*, 65 F.3d 13, 16–17
(3d Cir. 1995), illustrates this point.  Glass argued that his
PTSD caused him to be in a dissociative state at the time
he committed a killing, undermining his ability to form the
requisite intent.  We concluded that Glass did not satisfy
the "no reasonable juror" standard and thus was not
"actually innocent."  Despite the new evidence of Glass's
mental state, the record evidence also supported a guilty

67

verdict: "there was evidence that Glass went to the murder scene armed and that he had earlier behaved violently towards the victim. Moreover, when arrested, Glass did not give the police the explanation he now proffers—that he had no memory of what happened—but relied instead on an alibi that he was not even at the scene when the killing occurred." *Id.* at 17. Thus, even considering the new psychological evidence, we could not conclude that that no rational juror would have voted to convict Glass of first-degree murder.

As in *Glass*, the evidence before us on both sides of the sanity and *mens rea* issues is such that we are unable to say that no reasonable juror could conclude that Wallace was sane and able to form the requisite *mens rea* to commit murder. Wallace's purportedly new evidence of actual innocence is not so compelling that it undermines our confidence in the outcome of his case.

In short, Wallace does not satisfy the actual innocence standard.

C. *Evidentiary Hearing and Expert Funds*

Finally, Wallace asks us to consider whether the District Court erred in dismissing his motion for expert

funds.[32] In regard to his actual innocence claim, Wallace's reason for requesting an expert is to opine on whether Ritalin could have so exacerbated his mental illness as to render him insane at the time of the crime. But as we have already discussed, the issue of Wallace's mental state was explored at the time of his pre-trial proceedings and guilty plea, and both then and now it is highly debatable. His "new" evidence is only Dr. Cooke's tentative opinion about Ritalin's possible role: that Ritalin could at most provide a "partial defense." JA 801. This tepid evidence is hardly strong enough to undermine confidence in the criminal proceeding's outcome, and even if Wallace had proffered more powerful expert testimony regarding the side effects of Ritalin, the countervailing evidence of record is such that he would be unable to show that "no reasonable juror" would convict him of murder.

Thus, an expert's testimony is unnecessary to resolve Wallace's actual innocence claim. The District

---

[32] Although Wallace's motion to the District Court was limited to funds for an expert, we presume this request implicitly included a motion for an evidentiary hearing at which to present the expert testimony.

Court did not abuse its discretion in declining to hold a hearing or in declining to order funds to retain an expert.

## VI.  CONCLUSION

Wallace filed his habeas petition in 2015, nearly a decade and a half after he pleaded guilty to third-degree murder.  In order for us to consider his petition on its merits, he must establish a basis for us to excuse or extend the one-year habeas filing deadline.  Although he argues for both an extension of the deadline based on equitable tolling and excuse from the deadline due to actual innocence, he has not met the standards for either form of relief.

Accordingly, for all the reasons discussed, we will affirm the District Court's judgment dismissing the petition on timeliness grounds.[33]

---

[33] Judge McKee would have ordered a remand, authorized funds for an expert, and directed that an evidentiary hearing be held on the medical issues pertaining to Wallace's ability to file for habeas relief.